**GLIDDEN COMPANY, Libelant,**
v.
**HELLENIC LINES, LIMITED,**
**Respondent.**

United States District Court
S. D. New York.
June 19, 1959.

Dow & Stonebridge, Daniel L. Stonebridge and Raymond W. Mitchell, New York City, of counsel, for libelant.

Haight, Gardner, Poor & Havens, New York City, Wharton Poor, and R. Glenn Bauer, New York City, of counsel, for respondent.

KNOX, District Judge.

The Glidden Company, libelant herein, is a large industrial enterprise, incorporated under the laws of Ohio. Hellenic Lines, Limited, respondent, is a Greek maritime corporation, with headquarters in Piraeus. It has offices in New York City, and various other ports; and is the owner and operator of 22 merchant ships.

Libelant sets forth three alleged causes of action, arising out of two contracts.

On September 7, 1956, libelant and respondent entered into a charter party, whereby respondent, as vessel owner, agreed to tender a vessel to libelant, at Koilthottam, on the west coast of India, for the purpose of loading and carrying 9,000 to 10,000 tons of ilmenite ore, from that port "via Suez Canal, or Cape of Good Hope, or Panama Canal, at Owner's option, declarable not later than on signing of Bills of Lading to one safe U.S. Atlantic Port, North of Cape Hatteras, Port at Charterer's option, to be declared not later than on vessel's passing Gibraltar * * *." Glidden agreed to pay freight at the rate of $16 per long ton.

On November 1, 1956, an addendum was added to the charter party. It provided that the ship, Hellenic Sailor, instead of the Grigorios C. III, previously named, was to perform the voyage.

Libelant charges that, on November 20, 1956, the Hellenic Sailor arrived at Koilthottam, but respondent refused to lift and carry the cargo tendered by libelant, and failed to tender the vessel to the Glidden Company, thereby repudiating and refusing to perform its obligations under the charter.

Libelant further avers that it was ready, able and willing, and duly offered, to perform its agreement with respondent. By reason of respondent's default, libelant was required to seek a substitute vessel to carry its cargo. Such substitute vessel was ultimately found, and chartered, but at a much higher freight rate. The substitute ship, being unable to reach Koilthottam until early December, it became necessary for libelant to obtain an extension of time within which to lift its cargo. Upon the foregoing premises, libelant claims damages in the sum of $120,000, and, also, a further sum of $20,000, to cover additional costs, and increased handling charges.

Libelant's second cause of action is to this effect: On November 1, 1956, libelant and respondent entered into three additional charter parties, whereby Hellenic Lines agreed to carry, in three monthly shipments—December, 1956, January and February, 1957—about 25,000 tons of ilmenite ore from Koilthottam, to one safe United States Atlantic port, north of Hatteras, at the rate of $18.50 per long ton.

Respondent, it is said, failed to observe its obligations under such charter parties. As a result, libelant was compelled to engage two substitute vessels, at a much higher freight rate, to carry 20,000 tons of ore, and incurred additional expenses, amounting, in the aggregate, to $300,000.

Libelant's alleged third cause of action asserts that, due to respondent's repudiation of its agreements, libelant was unable, within a required space of time, to engage a substitute vessel, to carry some 5,000 tons of ilmenite ore from Koilthottam to the United States, thereby reducing libelant's local supply of high grade ore, and necessitating a curtailment of its operations. Damages claimed in this cause of action amount to $100,000.

Respondent denies that it repudiated its obligations under the contract of September 7, 1956. It also denies the allegations in libelant's second cause of action. As respects the third cause of action, respondent denies that it has knowledge or information sufficient to form a belief as to the allegation contained therein. Respondent admits demand and nonpayment of the damages claimed.

As a separate and complete defense to libelant's first cause of action, respondent asserts that Koilthottam, being on the west coast of India, the ordinary, usual, and shortest route from that location, to a United States port, north of Hatteras, was through the Suez Canal, the Mediterranean, and Straits of Gibraltar.

Respondent further alleges that, it was understood between the parties, that such route should be pursued, and the charter party provided that nomination of the discharging port was "to be declared not later than on vessel's passing Gibraltar."

Respondent also declares that, on November 5, 1956, British and French armed forces landed at Port Said, in an attempt to seize the Suez Canal. This invasion was resisted by the Egyptian Government which, in order to prevent use of the Canal, sank vessels therein, thus blocking the waterway, and rendering it unnavigable until April 10, 1957. A further allegation is that the unusability of the Canal, for a prolonged and uncertain duration, made performance of the contract between the parties impossible, and frustrated the adventure.

In addition, respondent interposes a defense based on Section 9 of the charter party, and alleges that closure of the Canal was either a restraint of princes and rulers, a danger and accident of the seas and rivers, or an unusual occurrence beyond control of either party, and terminated and frustrated the charter party, releasing both libelant and respondent from obligations thereunder.

Respondent further pleads the United States Carriage of Goods by Sea Act [Title 46 U.S.C.A. § 1304], and says that closure of the Canal, which prevented the voyage of the Hellenic Sailor, was a peril, danger and accident of the seas, or other navigable waters, or an act of war, or an arrest of, or restraint of princes, etc., or a cause arising without actual fault and privity of the carrier.

Similar defenses are interposed to libelant's second and third causes of action. In addition, it is claimed that, "If respondent entered into three additional charter parties with respondent, the same were reduced to writing, but never signed by either party."

As a partial defense to all causes of action, respondent asserts that, on or about November 13 to 16, it offered, without prejudice to either party, to perform the charter party of September 7, 1956, and the unsigned charter parties, by proceeding via the Cape of Good Hope, if paid $20.50 per ton with respect to all shipments; respondent agreeing that libelant might pay the additional freight under protest, and without prejudice to

its right of recovery, if it were ultimately decided that a right of recovery existed. Respondent offered to secure such repayments as to which libelant might be entitled.

Between November 21 and 29, 1956, respondent made a similar offer, except that freight should be calculated at $24 per ton.

Neither offer was accepted by libelant.

Before proceeding further, it seems desirable to identify the persons who played prominent parts in the factual situation here presented.

George M. Halsey is a vice president of the Glidden Company, and acted upon its behalf, with respect to transportation of libelant's ilmenite.

Pericles Callimanopulos is General Manager of respondent's New York office. Orestes Pendias was his assistant, and acted as such from 1948, until 1958, when he voluntarily resigned his position with respondent, and was employed by one of its competitors.

James R. McGrath, a vice-president of Meridian Marine Corporation, represented the Glidden Company in its transactions with respondent. McGrath and Pendias, some ten, or more, years ago, were business partners. Their friendship, through the years, has continued; and once, or more, a week, prior to this suit, they lunched together, and played a game, or two, of pool. On these occasions, they talked freely about "everything".

Callimanopulos and Pendias, also, were warm friends, and the former described Pendias as a competent, and loyal, employee. Callimanopulos and McGrath have long been acquainted, and McGrath has "consummated a number of charters for respondent's ships."

Pendias "stood up" at the baptism of one of McGrath's children, and Callimanopulos is the godfather of a child of Mr. and Mrs. Pendias.

The contract of September 7, 1956, reduced to writing by McGrath, and executed by both parties, is an admitted agreement of respondent.

The charter parties of November 1, 1956, were also prepared by McGrath, and sent to Hellenic Lines for signature. These documents, as heretofore stated, were never signed by either party.

In passing, it may be noted that, on some previous occasion, the phraseology of the charters was specified by libelant, and sent to McGrath. He had them printed, and these forms, with interlineations, made by McGrath, became the charter parties in suit.

The second, unnumbered, paragraph of the charters in controversy provides for a voyage by a vessel of respondent, from Koilthottam via Suez Canal or Cape of Good Hope, or Panama Canal, at Owner's option declarable not later than on signing of Bills of Lading, to one safe United States Atlantic Port, North of Cape Hatteras, at Charterer's option (to be declared not later than on vessel's passing Gibraltar), or so near thereto as she can proceed with safety, and there to deliver her cargo. The words in parenthesis were typewritten, and inserted by McGrath. The insertion came about as a result of a mishap, having to do with a port of discharge, of a former shipment of ore, in which libelant was involved. In other words, libelant did not wish to select a port of discharge until its cargo reached Gibraltar.

The background of this litigation, as indicated, is the closure of the Suez Canal, in 1956.

In a foreword to a voluminous publication, issued by the State Department, at Washington, in October, 1956, entitled, "The Suez Canal Problem—July 26—September 22, 1956", it is said:

"The purported nationalization of the Universal Suez Canal Company by the Egyptian Government on July 26, 1956, produced an international problem, carrying dangerous potentialities for the world. In Foreign Ministers talks from July 29 to August 2, the United States, the United Kingdom, and France, agreed that the Egyptian action threatened the freedom and security of the Canal, as guaranteed by the Convention of 1888.

"They agreed, further, that steps must be taken to assure the benefits of the Canal to all nations consistently with legitimate Egyptian interests. The three Governments, accordingly, proposed a conference of parties to the 1888 Convention, and of other nations which, by reason of ownership of tonnage or patterns of trade, were largely concerned with the use of the Canal * * * ".

The proposed conference was held, and its results were of a meagre nature.

On October 29, 1956, Israeli forces attacked Egyptian forces on the border between Israel and Egypt, in the Sinia Peninsula.

The parties in suit have stipulated that the following information appeared in New York newspapers, on the dates mentioned:

"On October 30, 1956, the British and French governments delivered an ultimatum to the Israeli and Egyptian governments, which the Egyptian government did not accept.

"On October 31, 1956, British and French aircraft began bombing Egyptian airfields.

"On November 5, 1956, British and French forces were landed at Port Said, Egypt, and attacked the Egyptian forces.

"On November 6, 1956, a 'cease fire' was agreed to between the British and French on the one hand, and the Egyptians, on the other, which 'cease fire' took effect at midninght, November 6–7, 1956, London Time.

"By November 8, 1956, it was known in New York that passage through the Suez Canal was blocked, as a consequence of the fact that a large number of vessels had been sunk therein, and there was no reliable information as to the date when these vessels would be removed, and the Suez Canal reopened,

"A number of vessels were caught in the Suez Canal, as a result of the blocking, and were unable to make their exit therefrom until January 8, 1957."

The Canal, it appears, was not reopened for commercial shipping until April 9, 1957.

Counsel have further stipulated that, the distance from Koilthottam, India, to Baltimore, Maryland, which was the destination of libelant's ilmenite, here involved, is about 8,675 miles, via the Suez Canal. Such distance, via the Cape of Good Hope, is about 11,351 miles.

The above mentioned distances are in nautical miles, and make no allowance for bunkering calls.

The evidence shows that a ship sailing from Koilthottam to Baltimore, cannot carry as much cargo, if it proceeds by way of Cape of Good Hope, as it might carry if it proceeded by way of Suez. In other words, the longer voyage would require the ship, in place of some cargo, to carry additional quantities of fuel, provisions, and water. Thereby, the earnings from the voyage would, correspondingly, be reduced; to say nothing of increased expenses for fuel, insurance, and other necessary charges.

On October 30, 1956, two days before the vessel, Hellenic Sailor, was nominated for the Grigorios C. III, McGrath wrote a letter to Pendias, in which he said:

"At this time it is expected that Larship of Baltimore, will function as charterer's agents at discharging port, but this will be confirmed with nomination of discharging port on vessel's passing Gibraltar."

Upon October 30, 1956, Britain and France were reported as having delivered an ultimatum to Israel and Egypt, and on the following day, the airfields of Egypt were being bombed.

Thus, it clearly appears that, notwithstanding the commotion and turmoil in Egypt, libelant's authorized agent seemingly thought and believed that the cargo, covered by the charter party of September 7, 1956, would move via Suez, and

not by the Cape of Good Hope, or the Panama Canal.

The events, which culminated in the closure of the Canal are recorded in an opinion of Judge Thomsen, Chief Judge of the United States District Court for the District of Maryland, in the case of Navios Corporation v. The Ulysses II, 161 F.Supp. 932.

In Judge Thomsen's opinion, he held that the president of Egypt, on November 1, 1956, made a declaration of war against the United Kingdom and France. The war, so declared, was of short duration, but its effect, so far as Suez was concerned, lasted for months, and disrupted one of the most important international trade routes of the world.

Many of the war-like developments in Egypt, as stipulated, were reported in local newspapers of the day. Persons in the shipping industry, and elsewhere, had the outstanding facts before their eyes.

Nevertheless, many of them failed to grasp the import of what they read. They seem not to have appreciated the fact that Egypt, although opposed by Britain and France, had a weapon of retaliation. Many persons, I suppose, indulged the idea that Egypt, standing alone, could do little to withstand the power and might of France and Britain. Egypt, however, simply cut off the supply of oil to their temporary enemies, and hostilities were ended. However, the cessation of hostilities did not clear the Canal of its obstructions.

Among the persons who doubted the possibility that the Canal would be closed were Callimanopulos, McGrath, and, perhaps, Halsey. Pendias, to some degree, thought that traffic through the Canal might become impossible.

As bearing upon this phase of the case, it is of interest to note that, upon July 24, 1956, respondent made a contract with the National Lead Company, whereby Hellenic Lines agreed to accept and transport 14 cargoes of ilmenite ore from Koilthottam to Sayreville, New Jersey, over a period extending from November, 1956, to March 31, 1957. The freight rate was fixed at $15 per ton.

This agreement contained the following provision:

"9. Effective closure of the Suez Canal, preventing eastward transit of owner's vessels to the Persian Gulf-Indian Ocean area, shall be deemed to be frustration of the Owner's obligation to tender such vessels to the Charterer for loading, and of the Charterer's obligation to ship under this Agreement, as long as the Suez Canal remains closed."

Libelant would not consent that such provision be inserted in its agreements with respondent. McGrath communicated this information to Pendias who, on behalf of respondent, had signed the contract made with National Lead Company. Pendias pressed McGrath for the inclusion of such clause in the contracts that were subsequently made with libelant. McGrath discussed the matter with Halsey, libelant's vice president. He told McGrath that "he couldn't buy it"; that his operations were not flexible enough. "If the Lead Company thought they could live with it, that was their business, but he couldn't live with it."

In negotiating the contract made with National Lead Company, respondent, in part, at least, was represented by McGrath.

As to whether McGrath repeated Halsey's comments, on the Suez Canal clause, to Pendias, does not appear. But, whether or not he did so, the charter agreement of September 7, 1956, came into existence.

Shortly thereafter, McGrath, on behalf of libelant, negotiated with Pendias, concerning the transportation of 25,000 tons of ilmenite ore from Koilthottam, to one United States Atlantic port, north of Hatteras.

At about this time, McGrath had a telephone conversation with Halsey in which McGrath said, "We had the tonnage in position and that * * * we could fix no Suez clause and (the freight) would not be over $19.00 and he (Mc-Grath) thought we could do less." As

a matter of fact, the freight rate was fixed at $18.50 per long ton.

According to McGrath, he said to Pendias, "We accept your offer to carry * * * 25,000 tons, you are fixed." Pendias replied, "Okay, fine. Make up the charter and send it over." This was on November 1, 1956. McGrath immediately drew up the charters and they, in duplicate, were sent by hand to respondent by a Western Union messenger. McGrath testified that it is customary for a vessel owner to sign a charter party, before the charterer does so.

Each of these charter parties was accompanied by a covering letter, dated November 1, 1958, addressed to O. Pendias, Hellenic Lines, Limited, which reads, "We enclose herewith original and duplicate copies of charter party in caption. Please sign and return original, at the same time advising how many photostatic copies you require."

At this time, Callimanopulos was not in New York. Two days before, on October 30th, he had gone away on a hunting trip, and did not return until November 7th or 8th. During his absence, he was completely inaccessible to members of his office staff. Before leaving New York, Callimanopulos "arranged everything to the best of (his) knowledge which (might) come up during his absence, and the way it should be dealt with * * *".

Before his departure from New York, Callimanopulos was indefinite as to whether he was aware that Pendias was negotiating with McGrath, concerning the carriage of 25,000 tons of ilmenite for the Glidden Company.

Under the alleged contract of November 1, 1956, McGrath's firm, Meridian Marine Corporation would be entitled to a commission of about $6,000.

The testimony given by McGrath is that, upon Thursday, November 1, 1956, he entered into a firm agreement with Pendias, and then prepared the three charter parties. These were sent to respondent on Friday, November 2nd. The next two days, Saturday and Sunday,

McGrath's office was closed. It was open on Monday, and closed on Tuesday, which was Election Day. The office was open on Wednesday and Thursday, November 7th and 8th.

On Monday, November 5th, McGrath asked Pendias if he had received the proposed charters, and was given an affirmative reply.

On November 7th, McGrath wrote a letter to Halsey. That letter enclosed the addendum to the contract of September 7, whereby the steamer, Hellenic Sailor, under date of November 1, 1956, was substituted for the vessel, Grigorios C. III. The memorandum stated that the laydays on the Hellenic Sailor were to commence on November 14, 1956, cancelling November 26, 1956. Halsey was asked to sign and return the addendum at his earliest convenience. The document was signed, and became a part of the contract dated September 7, 1956. McGrath then went on to say:

"It is not the undersigned's intention to provide owners with photostatic copies until we receive the three outstanding charters now in the hands of the owners."

This portion of McGrath's letter, he said, "would indicate that he was suspicious of the degree of performance 'we would receive' from respondent."

Being asked if he thought that (Hellenic Lines) might walk out of the contract, the witness replied, "No * * * I did not think that."

During the time that the unsigned charter parties were in respondent's hands, McGrath had a telephone conversation with Pendias, in which the latter said, "Mack, they will be signed and sent back in a matter of a couple of days." Also, upon one occasion during the delay, the two men met socially, and there was some talk about the charters. As to what was then said, McGrath was uncertain and indefinite.

On November 8, 1956, Callimanopulos had returned from his hunting trip; and he, Pendias and McGrath went to the office of Smith & Johnson, steamship brokers for the National Lead Company.

At this meeting, Hellenic Lines asked Smith & Johnson to tell National Lead Company that Hellenic Lines regarded their charters, under the aforementioned contract, as frustrated, and would have to be renegotiated at increased rates of freight. At this meeting, Callimanopulos did most of the talking, but Pendias participated in the discussion. McGrath said he was present "for whatever moral support Callimanopulos and Pendias thought they would need, in making this approach to the National Lead Company."

After Callimanopulos, Pendias and McGrath left the offices of Smith & Johnson, and were en route to their respective offices, Callimanopulos said to McGrath, "You had better tell your friends at the Glidden Company that they are going to have to pay more money, if they want their ships."

This statement surprised McGrath, and he replied, "I have to have it in writing." McGrath, although he had about $6,000 at stake in the way of commissions, made no protest, and returned to his office. In the late afternoon, McGrath received two letters from respondent, addressed to Meridian Marine Corp., each of which was signed, "O. Pendias, Assistant to the General Manager."

One letter is this:

"Glidore Charter Party dated September 7, 1956

"In view of the situation at Suez as it most unfortunately developed since the charter party was concluded, preventing the passage of vessels through that Canal, the captioned charter, and the obligations thereunder, have been frustrated. It was our mutual intention to have the vessel proceed via the Suez Canal, as evidenced by the typewritten insertion in the preface of the charter wherein discharge port was to be declared by your good selves not later than on vessel's passing Gibraltar. Thus, our option to pro-

ceed via Suez, which is of major importance, cannot be exercised, due to the closing of the Suez Canal.

"Nevertheless, in an effort to be of service * * * we would be willing to lift the cargo involved, carrying such via the Cape of Good Hope, at an adjusted rate of freight of $20.50 per ton of 2240 lbs., provided we have your consent tomorrow, November 9.

"We would appreciate your giving this matter your immediate attention and reply in order that we may make the necessary adjustments in our vessel's itinerary.

"This offer, if not accepted, is without prejudice to our rights. * * * "

The accompanying letter was captioned:

"25,000 Tons Ilmenite—Koilthottam (one U.S. N.H.)", and reads:

"With reference to our letter * * * of even date in connection with the charter party dated September 7, 1956, we wish to say that for the same reasons stated in that letter the booking of the cargo as above has likewise been frustrated.

"Nevertheless, in an effort to be of service * * * we would be willing to lift the cargo involved, carrying such via the Cape of Good Hope, at an adjusted rate of freight of $20.50 per ton * * *, provided we have your consent tomorrow, November 8."

The word, "booking", as contained in respondent's letter, concerning the 25,-000 tons of ilmenite, was interpreted by McGrath as covering " * * * less than a full and complete cargo." In most cases, you would call a booking a liner parcel; "parcel" implying a smaller percentage of the volume of the ship, something like a few cartons, or a hundred tons.

But, whatever may be the word's meaning, in the shipping industry, the letter, in no way, denounced or repudiated the contract, which McGrath says was negotiated with Pendias on November 1, 1956, and evidenced by the three charter parties that were sent to respondent, and never signed. Ordinarily, one would assume, if Callimanopulos believed that Pendias, in arranging for the carriage of 25,000 tons of ilmenite, had acted without authority, he would have been at pains to see that libelant was apprised of that fact. But this, until shortly before the trial, he never did. And why, it may be asked, did Callimanopulos fail to sign the letters sent to McGrath's concern?

As respects these charters, Pendias testified:

"About the middle of October, there was an indication from McGrath that the Glidden Company would have additional cargoes, and it is reasonable to assume that I must have discussed that possibility with * * * Callimanopulos, but * * * the Glidden Company people * * * were not (then) in a firm position, * * * and the 1st of November * * * the business was put to us firm by McGrath, and we agreed on the various terms for the carriage of the ore. When these charters were sent to us * * * they must have been received on the afternoon of November 2, which was a Friday. * * * With Callimanopulos away, I was busier than normal, and I did not even look at the charters; the 3rd and 4th of November was a week end, the 5th was a Monday, and the roofs had caved in on Suez, at that time. I had the problem of where our various ships were * * *, and rerouting them. We were extremely busy, and I didn't give much thought to these charter parties * * * They just laid there."

The witness said he thought he had authority to sign the charters. He also said that he did not tell McGrath whether he would sign them or not, and does not recall any conversation with McGrath

between November 2nd and 8th, when the letters, in which the assertion of frustration was made, were sent to McGrath's organization.

Counsel for respondent inquired of Pendias, "Had you ever before without express authority from Callimanopulos signed or entered into a contract of that magnitude?" The witness replied, "No, sir, I had not."

Nevertheless, when Pendias wrote his letters of November 8th to Meridian-Marine, it is reasonable to assume that Callimanopulos was fully aware of the unsigned charters, and that respondent was under obligation in connection therewith. Possibly, it was Callimanopulos who suggested that the proposed carriage of 25,000 tons of ore should be designated as a "booking", instead of "charters". In any event, I find that respondent recognized that, barring frustration, it was bound to carry 25,000 tons of libelant's ore.

After receipt of respondent's letter of November 8, 1956, McGrath went to Baltimore, and consulted with Halsey. He, after his talk with McGrath, said the Glidden Company are "big and honest people, and we will not be blackmailed."

McGrath replied, "Look, if we are going to pursue this course of action, I need an admiralty attorney. I need one for two reasons: I need one to protect the Glidden's Company's interests, and, too, I have to have an attorney to make sure that Meridian Marine Corporation does not appear in the middle. That was one of my greater concerns, my own skin." Halsey called an official of the Glidden Company, in Cleveland, and they selected an admiralty firm to represent the Glidden Company.

From there on, the controversy was directed by attorneys for the respective parties, and what transpired throws little light upon the matters in dispute.

Upon the evidence before me and, without going into further detail, I conclude that performance of each of the contracts in suit was frustrated by the closure of the Suez Canal.

Both litigants, from the outset of their negotiations, were aware that trouble of a serious nature was brewing in Egypt. This was true on September 7, 1956, when the first contract was made; and on November 1, 1956, when the contract having to do with 25,000 tons of ilmenite came into existence.

The litigants herein, had they given appropriate attention to the possibilities of impending events, might easily have avoided the situation in which they find themselves.

Libelant, due to a previous experience, considered it important that the port, at which its cargo should be discharged, should not be declared until the Hellenic Sailor reached Gibraltar. Had libelant indulged the slightest thought that the ship was under an obligation to proceed via the Cape of Good Hope, in the event that the Canal was closed, it might well have provided that the port of discharge should be declared when the vessel reached Dakar, or some other port, along the Good Hope route to the United States.

Under each of the charters, relating to libelant's ore, respondent had an option, declarable on or before signing bills of lading, to have its vessels proceed "via Suez Canal or Cape of Good Hope, or Panama Canal." As I interpret the contracts, it seems reasonable to suppose that when respondent, through no fault of its own, was deprived of its liberty of choice to carry libelant's goods "via Suez Canal", it was under no obligation to carry them by way of the Cape of Good Hope, or the Panama Canal.

A voyage by either of the last named routes, would be an entirely different undertaking than would be involved in carrying libelant's cargo to the United States, via the Suez Canal.

Events, over which neither libelant nor respondent had any control, prevented respondent from selecting a route which, at all times, was in contemplation of the parties, and which, each of them assumed, would be the route of the voyage.

As was said by Mr. Justice McNair, of the Queens Bench Division, 3 Weekly

Law Reports, August 22, 1958, pages 390–400, in the case of Carapanayoti & Co. Ltd. v. E. T. Green Ltd.:

"I feel no doubt at all that the continued availability of the Suez route was a fundamental assumption at the time * * * the contract was made, that to impose upon the sellers the obligation to ship by an emergency route via the Cape would be to impose upon them a fundamentally different obligation which neither party could, at the time when the contract was made, have dreamed, that the sellers would be required to perform and that, if the parties to the contract had thought of the matter at the time, both, as reasonable men, would have accepted at once that, if the canal was closed for an indefinite period when the sellers were not in breach for failure to ship earlier, the contract would be off. Justice and reason require that, in these circumstances both parties should be relieved from their obligations on the happening of the closing of the Canal without default of either party * * *."

The libel will be dismissed.