The GLIDDEN COMPANY, Libelant,

v.

HELLENIC LINES, LTD., Respondent.

United States District Court
S. D. New York.

Aug. 2, 1962.

Dow & Stonebridge, New York City, for libellants.

Haight, Gardner, Poor & Havens, New York City, for respondents.

SYLVESTER J. RYAN, Judge.

The controversy in suit arises out of a breach of four charter parties providing for carriage of ilmenite ore, which the Court of Appeals (2 Cir., 275 F.2d 253) found was not excused by the closing of the Suez Canal from November 2, 1956 to April 10, 1957; it remanded the suit to the District Court for assessment of damages. It comes to us on exceptions filed by both libelant and respondent to the report of the Commissioner appointed following the remand.

Familiarity with the opinion of the District Court (D.C., 182 F.Supp. 172) and of the Court of Appeals (2 Cir., 275 F.2d 253) is assumed.

Libelant claimed as damages resulting from respondent's failure to perform the following three items:

"1. The increased cost of freight on all the cargo carried by reason of having to find substitute vessels and an address commission;

"2. The increased price in the cost of the ore on the first shipment

because libelant was late in lifting the cargo;

"3. The increased cost of manufacturing operations at libelant's plant because of its inability to lift the balance of the cargo of ilmenite ore."

Respondent disputed all three items and sought to limit libelant's recovery to $90,000.00, the difference between the contract cost of carriage and an alleged subsequent offer to perform at a higher figure.

The Commissioner after hearings rejected respondent's contentions and awarded libelant damages in the sum of $169,080.74; both parties have excepted on the ground of insufficiency and excessiveness, respectively.

Libelant has filed 7 exceptions and respondent 11; we shall relate these exceptions to one another, whenever possible, as we consider them.

*Libelant's Exception No. 1 and Respondent's Exception No. 4.*

The Commissioner found that respondent "paid" into court the sum of $90,000 and offered to "buy" the cargoes at $20.50 per ton.

Both sides agree that no deposit into court was ever made by respondent. This is the fact for what does appear is that following the reference to the Commissioner, respondent, under Local Rule 24, offered to deposit $90,500 with interest but that no such deposit was ever made.

It also appears that this offer was "to carry" and not "to buy" and this change in the factual findings must also be made. Respondent's efforts to limit libelant's damages was based in large measure on this offer.

These exceptions to the Report are sustained and the findings are modified to conform to the facts above stated.

*Libelant's Exception No. 2.*

The Commissioner found that libelant claimed damages of $240,970.40 in the first *three* charters, and that its recovery should be limited to non-carriage of 25,000 tons—9,000 tons on the

first two substitute vessels and 7,000 on the third.

Libelant's claim arose out of the breach by respondent of all four charters and the sum sought to be recovered represented additional hire libelant paid for *three* substitute vessels to carry the entire cargo contracted to be carried under the four charters, save for 5,250 tons.

There were four charters: the first, dated September 7, 1956, for carriage of $\%_{10,000}$ long tons of ilmenite ore at vessel's option at $16 per ton, cargo to be lifted by November 30, 1956; and three others dated November 1, 1956 and providing respectively (1) for carriage of $\%_{10,000}$ tons of ilmenite ore, vessel's option, at $18.50 per ton, cargo to be lifted by December 31, 1956, (2) for carriage of $\%_{10,000}$ tons of ilmenite ore, vessel's option at $18.50 per ton, cargo to be lifted by January 31, 1957, and (3) for the furnishing by charterer and the carriage by vessel of charters a quantity of cargo which combined with the other cargoes furnished under the two charter parties dated November 1, 1956 totals 25,000 tons, to be lifted by February 28, 1957. The four charters added up to a total maximum of 35,000, minimum 34,000 tons contracted to be carried by Hellenic. Libelant obtained substitute tonnage for a total of 29,732.09 tons.

The cargo so carried was purchased by Glidden from Baird Chemical Corp., who in turn purchased it from Travancore Minerals India (a Government enterprise).

This exception must, therefore, be sustained; the Commissioner's finding and conclusions must be modified to conform to the facts stated, and libelant's damages, if any, not limited to three charters but extended to all four.

*Libelant's Exception No. 3.*

The report is amended to read "libelant" for "respondent". This was an obvious typographical error. This exception is sustained.

*Respondent's Exceptions Nos. 1, 2, and 3.*

These exceptions are taken by respondent on the ground that the Commissioner

failed (1) to limit libelant's damages to $81,968 or $90,500, the difference between the original charter rate and respondent's subsequent offer to carry the cargo, and (2) to find that respondent's offer was unconditional and without prejudice and that it should have been accepted by libelant, thus limiting its damages as above.

The evidence before the Commissioner concerning this offer disclosed the following facts: on November 8, 1956, Hellenic wrote Glidden that, because of the closing of the Suez Canal its obligations under the first charter of September 7, 1956 and the other three of November 1, 1956 were frustrated and offered to carry the 10,000 tons under the first charter and the 25,000 tons under the other three charters at an increased rate of $2.50 per ton over the $16 per ton and $18.50 per ton agreed on, provided Glidden accept the increase by the next day. Glidden replied on November 9, 1956 that it rejected respondent's claim of frustration but was agreeable to placing the additional freight demanded by Hellenic in escrow until completion of the four charters at which time the parties could submit the matter for judicial determination. Respondent replied that it considered libelant's suggestion a rejection of its offer. On November 13, 1956, respondent again approached Glidden requesting an outright payment of the additional freight ($20.50 per ton) without prejudice to Glidden's right to sue to recover it, offering to provide a guarantee for this sum. This offer Hellenic refused to put in writing, although requested by Glidden to do so. Respondent came back with a further proposal that it would carry all the cargo at $24 per ton (a further increase over the prior increase) if the additional freight were placed in escrow to be released to Hellenic Lines "if lower repeat lower court should decree that agreement is in fact frustrated." On November 14, 1956, libelant rejected this proposal limiting its right to appeal and repeated its prior offer to place the increased freight in escrow with the right to resort to legal channels including the

right to appeal open to either party. On November 16, 1956, respondent called suggesting prepayment of the increased freight or an acceptance of its escrow terms, threatening to tender its vessel to someone else. When Glidden refused to accede to this, respondent again repeated its claim of frustration. Shortly thereafter on November 20, 1956, Glidden learned from the supplier of the ore that the "Hellenic Sailor", which had been fixed to carry the cargo under the first charter, had been tendered to another charterer, National Lead. Glidden instructed Baird Chemical to tender Glidden's cargo to the "Hellenic Sailor". On that same day, November 21, 1956, Hellenic further proposed to Glidden to carry all the cargo of the four charter parties at a flat $24 per ton, deleting all claim of frustration. Glidden refused and repeated its escrow proposal of November 9th. On November 23, 1956, Glidden was informed that the Master of the "Hellenic Sailor" had refused to accept Glidden's cargo and had definitely tendered to National Lead. On November 24th, Glidden requested a month's extension from the supplier to lift the cargo.

This was the offer and these were the conditions found by the Commissioner upon which he concluded that respondent had made no such offer as would impose on libelant an obligation to accept in an effort to minimize its damages.

We find that Hellenic's offer was conditioned on one of two choices: (1) either prepayment of additional freight without prejudice to a suit to recover with no limitation on libelant's right to appeal (although only oral); or (2) an escrow deposit with a waiver of libelant's right to appeal.

Respondent's Exception No. 2 is sustained to the extent that the respondent's "without prejudice" offer did not include the waiver of appeal.

The duty cast on libelant to extenuate its damages, when respondent was in default of its contract, did not extend to an obligation on libelant's part

to accede to terms which materially altered the original agreement and which were not reasonable. (Canadian Industrial Alcohol Co. v. Dunbar Molasses Co., 258 N.Y. 194, 179 N.E. 383, 80 A.L.R. 1173.)

Glidden's conduct was not arbitrary or intransigent; until the last, November 23, 1956, it was attempting to compromise its differences with Hellenic and did more than was legally required of it in an attempt to carry out the charter. Glidden abandoned its efforts only when respondent, on November 23, 1956, gave unequivocal evidence of its refusal to continue bound by the charter parties. Respondent's Exceptions Nos. 1 and 3 are, therefore, overruled.

*Respondent's Exceptions Nos. 6, 7, 8 and 9.*

The evidence supports the Commissioner's finding that until November 23, 1956 the parties were negotiating over payment of the additional freight. In fact, it was Hellenic who on November 21, 1956 called Glidden's brokers and made the offer to carry the cargo at $24 per ton and to forget about frustration. The evidence also supports the Commissioner's finding that it was on November 23, 1956 that Glidden first attempted to find substitute tonnage and that it was reasonable and necessary under the circumstances for it to employ an additional broker. Libelant understood that the additional broker employed had international contacts and was in a better position to locate tonnage for its cargo. This was an extremely difficult task at the particular time in view of the fact that the closing of the Suez Canal had caused a shortage of available vessels; a fact attested to by Hellenic's expert witness. Hellenic, experienced and well informed in shipping matters, is charged with knowledge of the situation. When it refused to carry Glidden's cargo under the terms suggested by Glidden, it must have foreseen not only that Glidden would encounter difficulty in obtaining substitute tonnage but that it might very likely incur additional expense—by way of broker's services—in locating a vessel.

Respondent's Exceptions Nos. 6, 7, 8 and 9 are overruled.

*Respondent's Exception No. 5.*

■ Respondent contends that in any event libelant's damages should be limited to $116,636 because, by prudent and careful management, libelant could have obtained cheaper substitute tonnage. Specifically, it urges that in December, 1956, libelant could have chartered a vessel to carry the cargo under the first charter at $24.50 per ton; and in January, 1957, to carry the cargo under the second charter at $22.00 per ton; and in February, 1957, at $18.50 per ton, making a total of $644,215 or $116,636 over the freight fixed under the charters breached by respondent.

The evidence offered by respondent was negligible, consisting mainly of attempts to show other fixtures with other vessels by other parties for other cargoes from other parts.

However, assuming Hellenic could have established that other vessels were available at lower rates at that time, it is most peculiar that Hellenic should now be complaining that Glidden paid an excessive rate when Hellenic itself as late as November 21, 1956 offered to carry the cargo on all four charters at $24. per ton. If the rates above quoted were available to Glidden as Hellenic says, then Hellenic's rate on November 21, 1956 was considerably out of line and was further evidence of the unreasonableness of its demands and conclusively established absence of any obligation on the part of Glidden to accede to them.

Assuming that $26.50 was an excessive rate, it was a rate set by the ship owners as to which Glidden had no choice. It was obligated to lift the cargo by November 30, 1956. It was not until November 23, 1956, that Glidden found it necessary to retain additional brokers to locate a vessel; at this time, no extension of time to lift the cargo had been granted libelant. The extension of time and the fixing of the first substitute vessel occurred at the same time. Libelant was under no duty to gamble on receiving an

extension before looking for substitute tonnage. In fact, respondent now complains that Glidden had waited *too long!*

Under all the circumstances, there was certainly no legal obligation on libelant to risk losing its contract with its supplier while it was out bargaining for a reduced rate—assuming one was available (and this respondent has failed to establish).

Like observation may also be appropriately made with reference to the December and January charters; in fact, the rate of the January charter was but 50¢ per ton over what Hellenic had demanded from Glidden for all the cargo! Respondent's own evidence showed that the rates in January and February 1957 ranged much higher than the $24.50 per ton paid by libelant.

Although the last two of the charters with Hellenic were not to be performed until January and February 1957, and at a time when the rates might have dropped below the December rate, Glidden was under no duty to wait to see if this would happen. If Glidden had waited to find substitute vessels for the last two cargo shipments and the rates had gone up, Hellenic might well have charged Glidden with failure to act prudently.

The fact was that Hellenic repudiated all four charters; that Glidden accepted the repudiation as final on or about November 23, 1956; Glidden did all that could reasonably be expected of it in obtaining substitute tonnage.

Respondent's Exception No. 5 is, therefore, overruled.

*Libelant's Exceptions Nos. 2 and 6; Respondent's Exception No. 11.*

Libelant objects on the ground that here the Commissioner erred in that (1) he limited Glidden's recovery for substitute carriage to 25,000 tons rather than to 29,732.09 tons; the actual tonnage carried; and (2) that the Commissioner erred in his calculations in that he listed the cargo carried on the "Aristides" at $24.50 per ton instead of $26.50; and (3) that the Commissioner erred in his addition and arithmetical calculations.

Putting aside for the moment the mathematical errors, the Commissioner found that libelant had paid for substitute vessels a total of $766,939.18 for carriage of a total tonnage of 29,732.09:

(a)  9,630      tons at $26.50 on the  "St. Gregory"
(b)  9,621.65    "        "        "   "Aristides"
(c) 10,480.44    "        "        "   "Aghios Nicolaos"

---

or $240,970.40 over and above what it would have paid had respondent not breached its contract; and yet the Commissioner limited libelant's recovery to a total carriage of 25,000 tons—9,000 tons each on the "St. Gregory" and "Aristides" and 7,000 tons on the "Nicolaos". His basis for this limitation, the Commissioner stated, was that because under the first *two* original charters the cargo to be lifted was 9/10,000 tons "at the vessel's option" and because under the third charter the total to be carried by all three was 25,000, libelant's recovery should be limited to 9,000, 9,000 and 7,000 tons respectively.

The Commissioner overlooked the fact that there was a total of four charters: *three* charters providing for 9—10,000 tons vessel's option and a *fourth* providing for 7,000 tons, so that even on his theory the total limitation would have to be 34,000 tons. As for his legal theory, the Commissioner treated the 9—10,000 tons vessel's option as an alternative contract for the breach of which libelant must choose the alternative "that will result in the smallest recovery." (Citing Sec. 344, Restatement of Law of Contract)

Libelant concedes that had Hellenic tendered vessels to carry 9,000 tons under

**268**

the three charters and 7,000 tons under the fourth, its performance under the charters would have been complete and Glidden could not complain if it had a balance of cargo unshipped on its hands. Under the charters the election was Hellenic's to make at any time prior to the time set for performance. With respect to the first charter, Hellenic nominated "Hellenic Sailor" to carry the cargo but it does not appear that the vessel's maximum capacity was 9,000 tons so as to constitute an election to load 9,000 tons prior to the time set for performance. (Cf. W. R. Grace & Co. v. Luckenbach S. S. Co., 4 Cir., 258 F. 49, 53.)

■ We think the better rule to be that when the time for performance has passed with no election made by the defaulting party, there ceases to be any right on its part to force an election on the injured party; and that a plaintiff, while he may not enhance his damages, may elect the alternative he prefers. (Trustees of Columbia University in City of New York v. Kalvin, 132 Misc. 601, 230 N.Y.S. 386, affd. 225 App.Div. 653, 231 N.Y.S. 903.)

■ What Glidden did was find substitute vessels to load the cargo in an amount within that specified in the charters it had with Hellenic; the substituted performance was performance encompassed within those charters. There is no reason in law to limit libelant's recovery to the minimum performance of those charters. Respondent could have elected and did not; libelant after respondent's default need not make an election of options which at one time were available to respondent but which it failed to make.

Libelant's Exceptions Nos. 2 and 6 are sustained; Respondent's Exception No. 11 is overruled.

■ We conclude that libelant's recovery for substitute tonnage should be $240,970.40 the difference between what it paid and what it would have paid had Hellenic performed, the amount as computed by the Commissioner and not disputed as to arithmetical accuracy by respondent.

*Libelant's Exception No. 4.*

■ Libelant further excepts to the disallowance by the Commissioner of $14,000 as damages representing the increase in the price of the 10,000 tons of ore to be carried under the first charter, which increase libelant had to pay on December 7, 1956 allegedly because of its inability to lift the cargo by November 30, 1956. The Commissioner found that the increase was not an item of damage flowing from the respondent's breach.

In the contract between Baird Chemical and Glidden dated April 18, 1956 under which Baird agreed to sell to Glidden ilmenite ore "Quilon" grade it was purchasing from Travancore Minerals, the price quoted was $15.28 per ton F.A.S. plus "(b) Any sum which the Supplier (Travancore) shall add to the price to be paid by the undersigned (Baird) over and above the contractual amount now agreed to between the Supplier and the undersigned,"; the quantity was approximately 10,000 tons, the shipment from Koilthottam to be completed prior to end of November, 1956.

In the contract between Baird and Travancor (The Supplier) of April 6, 1956, it was noted "Entire quantity for supply to: The Glidden Company." The price quoted was "80 shillings per ton, * * * subject to revision by the Government (supplier) if revision by Government is made meanwhile. * * * plus F.A.S. at 16 shillings per ton", shipment was to be from Koilthottam Port "to be completed prior to the end of November, 1956. On October 19, 1956, Baird notified Travancore that Glidden had fixed the "Gregorios C.III" to lift the cargo sold under the contract.

On November 1, 1956, the parties substituted the "Hellenic Sailor" for the "Gregorios C.III"; on November 24, 1956, Glidden requested an extension of time to lift the first shipment of ore; on November 29, 1956, Travancore agreed to extend the time to load by the substitute vessel to December 15, 1956. On December 6, 1956, Travancore cabled Baird to the effect that the Government had raised the price of the ore to be lifted to 90

shillings (an increase of 10 shillings per ton) and requested immediate acceptance by Baird as the substitute vessel was reporting that evening. Baird thereupon advised Glidden and upon Glidden's acceptance on December 6, 1956, Baird cabled Travancore that it and Glidden agreed to the increased price. The modification of the contract between Glidden and Baird was incorporated in a letter from Baird to Glidden on December 7, 1956. Glidden paid Baird an increase of $1.40 per ton, which it sought to recover from Hellenic.

Glidden's acquiescence in the increase cannot be said to be unreasonable after Hellenic's breach. Glidden had requested an extension of time from Baird and the Supplier, thus giving clear indication that it intended to carry out its contract of purchase. Refusal to pay an increase, in the price, specifically provided for by the parties to the contracts, after having requested an extension of time to perform—might very well have subjected Glidden to a lawsuit by both the Supplier and Baird—to say nothing of the fact that it probably would have lost the cargo.

It is evident that had Hellenic not breached its contract, Glidden would not have had to pay this extra price. And if all that the law required of Hellenic was that it place Glidden in the position it would have been in had there been no default, Glidden would be entitled to recoup this sum.

But it is also evident that the rise in the price could have occurred at any time between April and November, 1956, irrespective of Hellenic's default. It was not, therefore, a probable and natural consequence of the default by Hellenic but rather a consequence of the provision in the contracts between the parties.

While it is not too unlikely that the rise in price followed in the wake of Glidden's predicament and its request for more time, we cannot say that it was such a probable result that Hellenic at the time it entered into the charter parties was bound to reasonably foresee.

There is no evidence that these provisions were ever brought to Hellenic's attention, but even if they were, we do not see how mere knowledge that something might happen whether or not there was a default can charge the defaulter with its happening.

The Commissioner was correct in rejecting this item of damage. Libelant's Exception No. 4 is overruled.

*Libelant's Exception No. 5.*

▪ Libelant has excepted to the denial of recovery of about $7.50 per ton for 5,250 tons of ore for which it was unable to find a substitute vessel. This figure is allegedly the increase in libelant's cost of production by mason of its inability to obtain this amount of ore. We assume that Glidden wanted this ore and was unable to find a bottom for it.

However, we agree with the Commissioner that Glidden has failed to establish this item of damage and this for three reasons: Glidden has failed (1) to establish any loss, or (2) to connect it to the breach of the charter party, or (3) to show that respondent had notice of such a probable loss.

The increased cost of production claimed by Glidden was really a loss of revenue earned from a byproduct derived from ilmenite "Quilon" grade ore in the production of titanium dioxide—a byproduct not present or lost when a substitute ore was used. Glidden showed that in 1957 it had purchased a substitute ore—slag from Canada; that the use of slag in producing titanium dioxide presented certain side reactions which because of water pollution laws in Baltimore (where Glidden's plant was located) made it necessary to neutralize this byproduct and thus lose it—as a source of revenue. This loss was calculated as follows: while the initial purchase cost of "Quilon" grade ilmenite ore was lower than that of slag, its conversion into titanium dioxide, by reason of the need to process it with sulphuric acid, raised its price above that of the conversion of slag—the total cost of purchasing and processing "Quilon" ore being $151.13 per ton while that of slag was $139.79 per

ton. This was an increase, however, which according to Glidden was more than offset by the revenue received from the byproduct of the "Quilon" ore—to wit $24.32 a ton—which subtracted from $151.13 reduced the overall cost of "Quilon" to $126.81 or $7.61 less than slag.

Assuming this to be the fact, the figures used by Glidden in comparing the cost of the two types of ore were not broken down sufficiently to establish this increased cost or loss of revenue, e. g., contract price, freight, stevedoring, dispatch were not itemized. Although this was an admittedly difficult task, it was absolutely necessary if it sought to charge Hellenic with such a specialized and technical item of damages.

In addition to this, Glidden failed to connect the purchase of slag from Canada with the non-receipt of the 5,000 odd tons of ilmenite "Quilon" ore from India resulting from Hellenic's breach. Glidden did not show how much ilmenite ore it had on hand when it purchased the slag, nor how much it used per month. It appeared that Glidden had been purchasing slag from Canada quite regularly since 1951 and had in fact received what appeared to be normal shipments between October 1 and November 1956; and December 1956 and January 1957. Finally before Hellenic could be charged with this special item of damage—for it clearly was not a foreseeable natural consequence, Glidden would have to show that when it entered into the charter parties with Glidden, Hellenic knew so much about Glidden's business operations that it should have anticipated that a breach on its part to carry the cargo might probably bring about such a loss to Glidden if, in fact, there had been one.

This, of course, Glidden has not done; and it cannot charge respondent with this item of damage.

Libelant's Exception No. 5 is overruled.

*Libelant's Exception No. 7 and Respondent's Exception No. 10.*

Both parties object to the Commissioner's deduction of dispatch money— libelant to the deduction from its recovery of $5,001.74 dispatch money earned in loading one of the substitute vessels and respondent on the ground that it is entitled to a credit of $14,120.97, the total dispatch money earned by libelant on all three vessels. There is no question that dispatch money earned by Glidden was:

| | |
|---|---|
| "Aghios Nicolaos" | $ 5,001.74 |
| "St. Gregory" | 2,691.38 |
| "Aristides" | 6,427.85 |
| Total | $14,120.97 |

The awarding of damages is to reimburse and not to enrich.

It makes no difference that Glidden earned this through its diligence, or that it might have earned similar dispatch on loading Hellenic's vessels. The test is what Glidden actually paid out as a result of Hellenic's default, not what it might have paid.

The $240,970.40 paid for substitute tonnage must be reduced by $14,120.97 dispatch money. Libelant's Exception No. 7 is overruled; Respondent's Exception No. 10 is sustained.

If libelant is to be made whole, it is entitled to interest on its damages. There are no exceptional circumstances to deprive it of an award of interest at the full rate of 6% from March 25, 1957, the date of the last payment for the substitute freights. Glidden was diligent in filing suit and prosecuting its action. The delays which encompass a period of over 5 years were not of its making (O'Donnell Transportation Co. v. City of New York, 215 F.2d 92 (C.A. .2)).

Respondent has filed to except to the Commissioner's fee within the time provided for by Local Rule 25(d). We agree with both parties that the report was too long delayed—one year from the last hearing. We have sustained several exceptions to the Commissioner's report, some of which were obviously caused by haste in its preparation. On the other hand, the amount in controversy was large; the questions of fact and law were substantial; there were 354 pages of

testimony, and 44 exhibits received on seven different days, plus the printed appendix and brief on appeal consisting of 311 printed pages. The report of the Commissioner was of some aid to the Court; perhaps not as much as it might have been, and he should be compensated. Because undoubtedly there were extenuating circumstances, we feel that a fair fee would be $3,500.00.

A final decree may be submitted in conformity with the above findings and conclusions.*

---

\*   Schedule of Rulings on:
  *Libelant's Exceptions*
  1.  Sustained; findings modified.
  2.  Sustained.
  3.  Sustained.
  4.  Overruled.
  5.  Overruled.
  6.  Sustained.
  7.  Overruled.

  *Respondent's Exceptions*
  1.  Overruled.
  2.  Sustained, as limited in opinion.
  3.  Overruled.
  4.  Sustained; findings modified.
  5.  Overruled.
  6.  Overruled.
  7.  Overruled.
  8.  Overruled.
  9.  Overruled.
  10. Sustained.
  11. Overruled.