The **GLIDDEN COMPANY**, Libelant-Appellee,

v.

**HELLENIC LINES, LIMITED**, Respondent-Appellant.

No. 233, Docket 27823.

United States Court of Appeals Second Circuit.

Argued Jan. 28, 1963.

Decided March 26, 1963.

Wharton Poor, New York City (R. Glenn Bauer, Haight, Gardner, Poor & Havens, New York City, on the brief), for respondent-appellant.

Daniel L. Stonebridge, New York City (Dow & Stonebridge, New York City, on the brief), for libelant-appellee.

Before LUMBARD, Chief Judge, and KAUFMAN and HAYS, Circuit Judges.

LUMBARD, Chief Judge.

This appeal questions only the measure of damages for the breach of four charter parties, as this court has already resolved the issue of liability in favor of Glidden, the libelant. 2 Cir., 275 F.2d 253 (1960). The appellant, Hellenic Lines, objects to only so much of the award for damages in the sum of $226,-849.43, together with interest and costs, as relates to the failure of the district court to reduce the amount of damages by the sum which Glidden would have saved had it taken what the appellant asserts were reasonable measures to mitigate its damages. We affirm the judgment of the district court.

Hellenic Lines, Ltd., is the owner of four vessels which, in September and November 1956, were chartered to Glidden to carry ilmenite ore from Koilthottam, India, to a United States Atlantic port north of Cape Hatteras at the rate of $16.00 per ton on one charter party and $18.50 per ton on the other three. Glidden required the ore to operate its new plants at Baltimore. On November 8, 1956, six days after hostilities between Israel and Egypt had caused the closing of the Suez Canal, Hellenic claimed that the charters were frustrated and it offered to carry all the ilmenite for $20.50 per ton. From then until November 23, representatives of Hellenic and Glidden were engaged in numerous discussions of proposals and counter-proposals for the transportation of the ilmenite. One of Hellenic's offers, while preserving Glidden's right to litigate its claim that the charter parties had been breached, would have barred Glidden from appealing from a decision of a court of first instance. A similar offer to carry ilmenite at $20.50 per ton, which would have safeguarded Glidden's contract rights without barring the right to appeal, was made orally in telephone conversations between the representatives of Glidden and Hellenic, but Hellenic never complied with Glidden's request that the offer be reduced to writing. Finally, on November 23, 1956, it became apparent that the parties could not reach any new agreement. As Glidden was forced to import the ore at the best price it could then arrange or allow its United States factories to stand idle, it chartered two vessels to carry the ore at $26.50 per ton and a third vessel at $24.50 per ton.

On March 25, 1960, after this court had held that the charter party had not been frustrated and had remanded the case to the district court for a determination of damages, the case was referred to a Commissioner and almost two years later, on February 10, 1962, the Commissioner filed a report awarding damages to Glidden in the amount of $169,-089.74. Judge Ryan reviewed the many exceptions which both sides took to the Commissioner's report. It is unnecessary to review in detail the numerous

errors in the Commissioner's report as we are in entire agreement with all of Judge Ryan's conclusions. 207 F.Supp. 262 (S.D.N.Y.1962).[1]

Judge Ryan found that if the charters had been performed Glidden would have paid $525,968.78 and that in fact Glidden paid $766,939.18 for the carriage of the 29,732.09 tons of ilmenite which it imported, less $14,120.97 dispatch money[2] which it earned and which had reduced its costs by that amount. Thus Judge Ryan allowed Glidden $226,849.43, with 6% interest from March 25, 1957, the date of the last payment for the substituted freight.

In overruling Hellenic's contentions that Glidden should have agreed to Hellenic's offer to carry the ore at $20.50 per ton, Judge Ryan concluded from the evidence that Glidden was under no duty to agree to terms which "materially altered the original agreement and which were not reasonable." 207 F.Supp. 266.

■ The sole point at issue on this appeal is whether Glidden acted reasonably to mitigate its damages, and this question turns on whether Glidden should have accepted any of the alleged offers made by Hellenic to carry the ore for $20.50 per ton. We think the evidence fully supports Judge Ryan's conclusions that Glidden acted reasonably in rejecting the offers made by Hellenic.

■ The law is well settled that where the shipowner does not furnish the charter vessels according to agreement, the charterer is under a duty to minimize damages by the exercise of reasonable diligence to procure comparable vessels on the best terms available. Sanders v. Munson, 74 F. 649–651 (2 Cir., 1896). The party injured by breach "cannot recover damages which arise by reason of his own inactivity or imprudence, and are not the necessary and natural consequences of the default of the other party." Ibid. Of course if the same vessels or comparable vessels may be chartered from the same shipowner, the charterer would be under a duty to make his best bargain there. Apparently this is precisely what Glidden sought to do and what Hellenic was prepared to do up to a point. Unfortunately they could not agree and in any event Hellenic was never willing to state its unconditional offer in writing. We think the record supports Judge Ryan's conclusions that Glidden acted reasonably in refusing to accept Hellenic's various offers in the form in which they were made during the period of continuous negotiating between November 8 and November 23, 1956.

The negotiations were carried on between Pericles Callimanopulos, General Manager of Hellenic Lines in New York, and James R. McGrath, Vice President of Meridian Marine Corporation also in New York, acting as broker for Glidden. Callimanopulos and McGrath were in constant touch with each other by telephone, through a teletype system and on

1. The Commissioner made numerous errors which demonstrated that he was less than careful in preparing his report. For example, although this court had found that four charter parties were in effect, the Commissioner considered only the last three in his assessment of damages. He deducted dispatch money for only one of the three substitute vessels. He calculated the freight on one substituted vessel at $24.50 per ton, when the price paid was $26.50 per ton. He made a multiplication error amounting to $30,000. As a result of the Commissioner's errors, Judge Ryan was called upon to consider many exceptions filed by both parties. He sustained four exceptions by Glidden and three by Hellenic. It is true that Hellenic failed to except to the amount of the Commissioner's fee as fixed by the court within the time specified by the Rules of the District Court. Here, however, the amount allowed is so far out of line with the value of the services rendered that we must ourselves take note of that fact. Accordingly, the allowance to the Commissioner should be reduced from $3,500 to $1,500.

2. Dispatch money is the reduction in charter hire earned by the charterer in the event he does not employ the vessel for the full allowed laytime during the loading and/or discharging of the owner's vessel.

several occasions they had face to face conversations.

In two letters of November 8 signed by Orestes Pendias, Callimanopulos' assistant, Hellenic claimed that the charter parties were frustrated and it offered to lift all the cargo for $20.50 per ton. Glidden's broker responded by teletype on November 9, offering to place the additional freight in escrow, the dispute to be settled by litigation upon completion of all the voyages. On the morning of November 13, Callimanopulos telephoned McGrath and offered to allow Glidden to pay the difference in freight without prejudice and further offered a bank guarantee of the amount. McGrath asked Callimanopulos to confirm this offer in writing but Hellenic never complied with this request. In further reply to the telephone offer, and at the instruction of Glidden, McGrath sent a teletype message to Callimanopulos declining to make an outright payment of the additional freight but offering to place it in escrow subject to subsequent determination by the courts. Later in the same day, by teletype, Callimanopulos stated that some form of escrow would be agreeable but only on condition that a decree of the lower court should be dispositive of any litigation. Still later that day Glidden rejected the limitation on its right to appeal from any lower court decision and reiterated its previous offer. The net result of all this was that the only reasonable offer which Hellenic made and which Glidden would have been required to accept was never reduced to writing, namely, the offer that the additional freight be paid outright with Hellenic's supplying a bank guarantee to reimburse Glidden in the event that Glidden's position was sustained in a litigation.

Further negotiations between the parties after November 13 failed to break the impasse. Although Hellenic's telephone offer of November 13 was repeated both on November 14 and twice on November 16, Glidden was under no duty to accept such an offer, which Hellenic refused to put in writing despite repeated requests. We find that Glidden's decision not to accept the offer was reasonable. See The S. L. Watson, 118 F. 945, 951 (1st Cir., 1902). In view of the amount of money involved and the necessity of having the terms clearly understood, it was essential that the terms of Hellenic's offer be placed in writing. Indeed, an unimpeachable record was doubly important because the parties were already in disagreement over whether or not the original charter parties had been frustrated, and their differences could probably not be settled without litigation. It would have been highly imprudent for Glidden to pay the additional freight without having the clearest kind of evidence that Hellenic was bound to supply a bank guarantee to repay this should Glidden have been successful in the forthcoming litigation. Failure to insist upon a written confirmation of Hellenic's oral proposals would have seriously jeopardized Glidden's chances of recovery. Under these circumstances it was reasonable for Glidden to reject the offer.

On November 29 and December 8, Glidden chartered two vessels at $26.50 per ton and later, on December 14, an additional vessel at $24.50 per ton. It is not seriously disputed that this was the best bargain that Glidden could make in view of its failure to reach an agreement with Hellenic. As under the circumstances Glidden was within its rights in rejecting the conditional and oral offers of Hellenic, it is entitled to recover from Hellenic the difference between the freight stipulated in the charter parties with Hellenic and the price which it actually paid for the carrying of the ilmenite.

The decree of the district court is affirmed. The amount of the Commissioner's fee is reduced to $1,500.

HAYS, Circuit Judge (concurring and dissenting).

It was unreasonable for Glidden to pay $24.50 and $26.50 a ton when Hellenic repeatedly offered to carry the ore for $20.50 per ton.

Hellenic's offer of November 8 was in writing and could have been accepted "without prejudice." I find no evidence in the record of "refusal" to put the later offers in writing. In fact Glidden's repeated counter-proposals appeared to make such a course fruitless, and there is no indication whatever that Glidden's failure to accept the later offers was based on their not being made in writing

I therefore respectfully dissent.

I concur, however, in the opinion of the court as to the reduction of the Commissioner's fees.