467 F.2d 588
 11 UCC Rep.Serv. 261
 GURNEY INDUSTRIES, INC., Appellant,
v.
ST. PAUL FIRE AND MARINE INSURANCE COMPANY, and Robert P.
Perrin, Trustee in Reorganization for Roberts
Company and Roberts Engineers, Inc., Appellees.
GURNEY INDUSTRIES, INC., and Commercial Credit Industrial
Corporation, Appellees,
v.
Robert P. PERRIN, Trustee in Reorganization for Roberts
Company and Roberts Engineers, Inc., Appellant.
 Nos. 72-1160, 72-1161.
 United States Court of Appeals,
Fourth Circuit.
 Argued June 8, 1972.
Decided Sept. 14, 1972.
 
 John W. Riely, Richmond, Va. (Allen C. Goolsby, III, Harry D. Saunders, Richmond, Va., Hunter M. Jones, Charlotte, N. C., Walter S. Beck, New York City, James Mullen, and Hunton, Williams, Gay & Gibson, Richmond, Va., Jones, Hewson & Woolard, Charlotte, N. C., Phillips, Nizer, Benjamin, Krim & Ballon, New York City, and Mullen, Holland & Harrell, Gastonia, N. C., on brief), for appellant Gurney Industries.
 Francis H. Fairley, Charlotte, N. C. (Fairley, Hamrick, Monteith & Cobb, and William Single, III, on brief), for appellee, Commercial Credit Industrial Corp.
 Welch Jordan and A. L. Meyland, Greensboro, N. C. (Jack Hart, New York City, Jordan, Wright, Nichols, Caffrey & Hill, Greensboro, N. C., Hart & Hume, New York City, and Block, Meyland & Lloyd, Greensboro, N. C., on brief), for appellees St. Paul Fire and Marine Ins. Co. and others and appellant Robert P. Perrin.
 Before BOREMAN, Senior Circuit Judge, and CRAVEN and BUTZNER, Circuit Judges.
 BUTZNER, Circuit Judge:
 
 
 1
 Gurney Industries, Inc., appeals from an order of the district court which, it complains, allowed inadequate damages in an action against St. Paul Fire & Marine Insurance Co. on a performance bond for the design, construction, and equipment of a yarn spinning mill. Robert P. Perrin, trustee in reorganization under Chapter X of the Bankruptcy Act for Roberts Co. and Roberts Engineers, Inc., the contractors, appeals the court's denial of his claim for work on the building. Gurney Industries, Inc. v. St. Paul Fire & Marine Insurance Co., 334 F.Supp. 845 (W.D.N.C.1971).
 
 
 2
 We affirm the judgment of the district court in part, but remand the case for further proceedings to determine the amount of additional damages to which Gurney is entitled.I
 
 
 3
 On September 23, 1968, Gurney Industries, Inc. and Roberts Co. and Roberts Engineers, Inc. (Roberts) entered into a contract under which Roberts agreed "to design, construct and fully equip for Gurney a new and complete Yarn Spinning Mill . . . for a total Contract Price of $3,500,000 . . ." at Prattville, Alabama. Other documents dated contemporaneously with the Gurney-Roberts contract were: a purchase order, by which Commercial Credit Industrial Corp. bought from Roberts a considerable portion of the equipment which Roberts was to install in the yarn spinning mill; a lease of that equipment to Gurney by Commercial Credit; and a progress payment agreement running from Gurney to Commercial Credit. At the same time, St. Paul Fire & Marine Insurance Co. became surety on a bond in the amount of $3,400,000 guaranteeing Roberts' performance.
 
 
 4
 Paragraph 7 of the spinning mill contract between Robert and Gurney provides:
 
 
 5
 "Each month during the course of this Project, Roberts Engineers will submit to Gurney invoices representing eighty-five per cent (85%) of the value of work performed on the construction, and on the project machinery listed in Schedule III, plus materials and project machinery delivered to the job site or suitably stored, less the aggregate of prior progress payments, which invoices Gurney shall arrange to have paid net within ten (10) days after invoice date, and Roberts will submit to Commercial Credit invoices representing eighty-five per cent (85%) of the agreed price of project machinery listed in Schedule IV delivered to the job site and/or suitably stored in a manner acceptable to Gurney, less the aggregate of prior progress payments.
 
 
 6
 "The remaining ten per cent (10%) of the Contract Price shall be paid upon acceptance of the Project, by Gurney as to Schedule III, and by Commercial Credit as to Schedule IV, after certification by Roberts Engineers that the Project has been completed. 'Completion of the Project' shall mean: (a) That the building has been constructed in accordance with the Building Contract Documents, and such construction and engineering has been approved, (b) That all equipment, machinery and fixtures have been installed and are in operating condition, (c) That the machinery and equipment is capable of producing 100,000 pounds of 26's single yarn of sixty per cent (60%) combed cotton and forty per cent (40%) carded cotton material each week through said Mill; and (d) That the product at each stage of the manufacturing process of the yarn meets the 'A' Quality Standards established by N. C. State University, at Raleigh, North Carolina, which said standards are attached hereto as Schedule V. In the event the Parties hereto fail to agree as to the fulfillment of such product standards, samples of each product at each stage of the manufacturing process shall be submitted to N. C. State University Testing Division for final determination of the issue."
 
 
 7
 The evidence discloses that the machinery Roberts furnished lacked the capacity to produce the quantity and quality of yarn specified in the contract. Therefore, the central issue in this aspect of the case is whether paragraph 7 was a warranty of quantity and quality, as Gurney contends, or a mere condition precedent to the payment of the 10 per cent retainage, as Roberts and St. Paul urge. If the paragraph constitutes a warranty, Gurney is entitled to damages exceeding the retainage. If, on the other hand, it is a condition, Gurney may refuse to pay the final 10 per cent of the contract price, but is entitled to no other damages. The district judge ruled that under North Carolina law, which the parties agree governs this issue, Gurney's remedy was limited to the retainage.
 
 
 8
 The contract, of course, does not expressly state that the right to the 10 per cent retainage shall be the sole remedy if Roberts fails to construct a manufacturing plant that meets the specified production requirements. Nor does the inclusion of the production requirements in the payment clause conclusively establish retainage as the only remedy. The same clause also provides for payment of 85 per cent of the contract price upon submission of invoices by Roberts,[1] but significantly the clause neither prohibits nor permits recoupment of these payments if the contract is breached. Moreover, the same clause mentions the completion of the building in accordance with the contract documents in precisely the same terms as it refers to the production requirements. But the district court did not limit Gurney's remedy for Roberts' failure to construct the building properly to the retainage. It allowed Gurney conventional damages for that part of its claim.[2] Because of these ambiguities and incongruities, we must examine the pertinent evidence relating to the drafting of the contract.
 
 
 9
 The origin of the contract's production requirements was disclosed by the testimony of Robert E. Pomeranz, president of Roberts. While there is some dispute about who initially proposed the North Carolina State University standards to measure the quality of the yarn, there is no doubt that Roberts knew Gurney insisted on written assurances the plant would meet these specifications. Pomeranz admitted that Gurney's president told him Roberts would have to agree to the university's standard. Pomeranz testified that he then drafted the contract with the intention of tying the production requirement to payment of the retainage. He did not claim that he ever divulged his intention to Gurney officials, or that they told him they agreed to this limitation of what to them was an essential term of the contract. Nor can the intention of the parties be gleaned from Roberts' rejection of a liquidated damage clause that Gurney proposed.[3] In rejecting the clause, Roberts did not notify Gurney that its machinery and equipment was not guaranteed to meet production requirements, nor did it explain that meeting those requirements was simply a condition to receiving the retainage. If Pomeranz had reservations about the rejected clause other than the provision for liquidated damages, he did not make them known to Gurney.
 
 
 10
 Pomeranz's subjective, unexpressed intent is immaterial. Howell v. Smith, 258 N.C. 150, 128 S.E.2d 144 (1962). We must interpret the language of the contract in the light of North Carolina law, which fortunately furnishes reliable guideposts. Quoting the Restatement of Contracts Sec. 261 (1932), the North Carolina Supreme Court has held, "Where it is doubtful whether words create a promise or an express condition, they are interpreted as creating a promise . . . ." Harris & Harris Construction Co. v. Crain & Denbo, Inc., 256 N.C. 110, 123 S.E.2d 590, 595 (1962). The Uniform Commercial Code, which governs the sale of the equipment and machinery, specifies, "Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." And it is unnecessary to the creation of the express warranty that "formal words such as 'warrant' or 'guarantee"' be used. N.C.Gen.Stat. Sec. 25-2-313(1)(a) and (2) (Repl.Vol.1965). As the state comment makes clear, this provision works no change in the pre-code law of North Carolina. See, e. g., Potter v. National Supply Co., 230 N.C. 1, 51 S.E.2d 908 (1949).
 
 
 11
 No doubt the remedy for failure to meet the quantity and quality standards could have been limited by the parties to the 10 per cent retainage, but if this had been intended as the exclusive remedy, the contract should have clearly and expressly said so.[4] Since it did not, the whole gamut of remedies must be deemed available. Indeed, that this was the intent of the parties is apparent from an addendum, "in clarification of the foregoing Contract," which they affixed to the contract on September 23, 1968:
 
 
 12
 "To the Contract is added an additional Paragraph 15 as follows:
 
 
 13
 "Payment of the Ten Per Cent (10%) of the purchase price of the Equipment retained by Commercial Credit Industrial Corp. shall not constitute any waiver of any rights of Gurney or any release by Gurney of its rights to enforce applicable warranties as to the performance of the Project as provided in Paragraph 7 of the Agreement."
 
 
 14
 We believe this contemporaneous reference by the parties to the production requirements as "warranties" and their specific acknowledgment of Gurney's preservation of its "rights to enforce" the warranties negate the Roberts-St. Paul contention that the paragraph 7 requirements were merely conditions to the payment of the retainage. See American Trust Co. v. Catawba Sales & Processing Co., 242 N.C. 370, 88 S.E.2d 233, 239 (1955).
 
 
 15
 St. Paul's obligation as surety embraced the construction of a manufacturing plant that would meet the production requirements of paragraph 7. The application to St. Paul for a performance bond for the project, the bond itself, and the invoice bore the legend, "Yarn Spinning Plant for Gurney Industries, Inc. including production requirements as set forth in Clause 7 of said contract." Gurney's retention of 10 per cent of the contract price did not discharge the surety's obligation. Retainage provisions are common in construction contracts, but withholding of the retainage is not generally considered to be the sole remedy available to the owner. On the contrary, the retainage is simply security for performance designed to benefit both the owner and the surety. See Knutson v. Metallic Slab Form Co., 130 F.2d 200 (5th Cir. 1942).
 
 
 16
 We conclude, therefore, that the production requirements were warranties, not conditions to receipt of the retainage.
 
 II
 
 17
 As an additional defense, Roberts and St. Paul assert that Roberts was not in default because the contract does not contain a date for meeting the production requirements and the work schedule set forth as one of its terms simply "projects" or estimates the time required for various stages of construction. The district court agreed. But under the law of North Carolina the court was not restricted to the four corners of the Gurney-Roberts contract. The contemporaneously dated Commercial Credit-Roberts equipment purchase order, the Commercial Credit-Gurney equipment lease, and the progress payment agreement are integral parts of the contractual arrangement intended to lead to the construction of an operational mill. To ascertain the intent of the parties the court was required to look to all of the papers. Borrowing from Peterson v. Miller Rubber Co., 24 F.2d 59, 62 (8th Cir. 1928), the Supreme Court of North Carolina has stated:
 
 
 18
 "A contract may be contained in several instruments. These if made at the same time, in relation to the same subject-matter, may be read together as one instrument, and the recitals in one may be explained or limited by reference to the other. This rule obtains even when the parties are not the same, if the several contracts were known to all the parties and were delivered at the same time to accomplish an agreed purpose." American Trust Co. v. Catawba Sales & Processing Co., 242 N.C. 370, 88 S.E.2d 233, 238 (1955).
 
 
 19
 It is of importance, too, that the parties obviously intended all of these documents to comprise their agreement because they are cross-referenced. The Gurney-Roberts contract refers to both the Commercial Credit-Roberts purchase order and the Commercial Credit-Gurney equipment lease. The Commercial Credit-Gurney progress payment agreement incorporates both the contract and the lease. From these integrated documents it is clear that June 30, 1969 is the date the parties intended as marking the beginning of operation according to the specifications of paragraph 7. Both the purchase order and the progress payment agreement obligated Gurney to activate the equipment lease with Commercial Credit on that date. This meant, in short, that Gurney committed itself to monthly payments of approximately $26,500 for 10 years, or, if it refused to activate the lease, to reimburse Commercial Credit immediately for its advances. All the parties were aware of this provision and the June 30, 1969 deadline; all must be bound by it now.
 
 
 20
 North Carolina has also observed that the conduct of the parties is a valid indicium of their interpretation of the contract, and that their construction of the agreement is one of the best indications of its meaning. American Trust Co. v. Catawba Sales & Processing Co., 242 N.C. 370, 88 S.E.2d 233, 239 (1955); Jones v. Palace Realty Co., 226 N.C. 303, 37 S.E.2d 906, 907 (1946). Applying these principles, we note that on June 17, 1969, Roberts prepared a proposed addendum to the Gurney-Roberts contract. It read in pertinent part, "[I]t now appears that the test for the quality standards set forth in paragraph 7 of the Contract may not be completed by June 30, 1969 . . . . It is, therefore, agreed as follows: 1. The time within which the quantity and quality production standards specified in paragraph 7(c) and (d) of the Contract shall be satisfactorily demonstrated is extended to September 1, 1969." The addendum was not accepted by Gurney, but it illustrates that Roberts knew of the significance of the June 30, 1969 date.
 
 
 21
 Earlier, the time schedule was the center of discussion in an exchange of letters between the presidents of Gurney and Roberts. Gurney's president wrote, "I am becoming quite uncomfortable about meeting the June 30 deadline that [Commercial Credit] insisted upon. . . . Please write me giving me some assurance that we are not going to push this deadline as close as it appears." Roberts' president responded by return mail, "Please accept my complete assurance that this project will be finished on schedule." Not yet satisfied, Gurney's president wrote again,
 
 
 22
 "You still haven't answered my question. We have no idea of what your interpretation of the 'schedule' is . . . It is expected that some time will elapse in order to test all of the equipment after it is installed and yarn is brought thru to meet the standards before we consider taking over the lease. This fact makes it very important that you give us a date as to when installation will be completed so that we will know whether or not we have a comfortable margin of time between that date and Commercial Credit Industrial Corp's target date of June 30th, 1969 to take over the lease."
 
 Roberts' president's response was:
 
 23
 "1. We anticipate having approximately one-fourth of each operation installed ready to run by the end of January; about one-half of each operation ready to run by the end of February; three-fourths ready to run by the end of March; about 90% ready to run by the end of April and everything virtually complete and ready for running by the end of May.
 
 
 24
 "2. As we have previously indicated, we anticipate that the first yarn production will actually occur about the end of February, so the above schedule provides about a month to proveout each operation and eliminate any problems that may appear."
 
 
 25
 By way of corroboration, the equipment lease provided that time is of the essence, as did the building specifications, which were part of the Gurney-Roberts contract. Taken together, all of these circumstances establish that June 30, 1969 was the date intended for the plan to meet the paragraph 7 standards. See Roos v. Lassiter, 188 F.2d 427, 429 (5th Cir.), cert. denied, 342 U.S. 876, 72 S.Ct. 166, 96 L.Ed. 658 (1951).
 
 
 26
 Roberts and St. Paul contend the trial court properly held that in any event Gurney waived the time requirement by permitting Roberts to continue working for approximately fourteen additional months at the site in an attempt to put the plant in operational condition. Gurney concedes that it permitted Roberts to continue its efforts to get the plant working. It states, however, that this permission was granted without prejudice to any rights it had because of the Roberts default, and that it was done solely to minimize its damages.
 
 
 27
 Before the end of June 1969, when it became apparent that Roberts would not complete the project on time, Gurney indicated its alarm by sending telegrams to both Roberts and St. Paul. The tenor of these dispatches was that neither party would be excused from meeting the June 30 deadline. Indeed, on the first day of July 1969, Gurney telegraphed St. Paul informing it that Roberts was then in default. Similar messages, self-serving but nonetheless adequate to inform St. Paul and Roberts that Gurney considered the June 30 date critical, were sent later in the year while Roberts was still working to complete the contract.
 
 
 28
 Gurney is not mistaken in its belief that even after default it was obligated to expend a reasonable effort in mitigating its damages. Harris & Harris Construction Co. v. Crain & Denbo, Inc., 256 N.C. 110, 123 S.E.2d 590, 598 (1962); Troitino v. Goodman, 225 N.C. 406, 35 S.E.2d 277, 284 (1945). The evidence is clear that some of the equipment which Roberts was unable to bring up to the operational standards of paragraph 7 was prototype equipment. Only Roberts' personnel understood the equipment well enough to attempt to make it work satisfactorily. Permitting Roberts to continue working on the equipment, therefore, was reasonable under the circumstances.
 
 
 29
 From all we have said, it is certain that Gurney had no intention of waiving the breach of the contract, nor could Roberts have been misled into thinking it did. The controlling law has been well stated by the North Carolina Supreme Court, "There can be no waiver unless so intended by one party, and so understood by the other, or one party has so acted as to mislead the other." Harris & Harris Construction Co. v. Crain & Denbo, Inc., 256 N.C. 110, 123 S.E.2d 590, 596 (1962). The cases upon which St. Paul and Roberts rely may readily be distinguished. In United States for Use and Benefit of R. E. Lee Electric Co., Inc. v. Stack, 308 F.Supp. 46 (E.D.Va. 1968), aff'd per curiam, 420 F.2d 698 (4th Cir. 1970), timely performance of a contract was deemed waived because work was permitted to continue beyond the termination date without conditions or limitations; in Taylor v. Goelet, 208 N.Y. 253, 101 N.E. 867 (1913), no date was fixed for completion of the project.
 
 
 30
 We, therefore, conclude that Gurney did not waive Roberts' obligation to meet the production requirements within the time fixed by the parties.
 
 
 31
 Finally, St. Paul insists that Gurney's refusal to permit substantial replacement and modification of equipment in September 1970 excused Roberts and St. Paul from further efforts at making the mill operational and constituted an assumption by Gurney of sole responsibility for it. The evidence shows, however, that from the date of default, Gurney continually made clear its intention to retain all its contractual rights even though it permitted Roberts to continue its efforts to bring production up to the paragraph 7 standards. In June and again in August 1970, Gurney notified St. Paul and Roberts that written requests for changes in the equipment should be presented to Gurney before they were made. However, in July 1970, St. Paul authorized installation of three truckloads of machinery without complying with these instructions. Indeed, the contents of the trucks became known only after two of them arrived at the plant in September 1970, one week before the trial was scheduled to start. Even then Gurney did not absolutely refuse entry. It did, however, apparently on the advice of counsel, insist that St. Paul and Roberts supply it with a description of the machinery so that its experts could intelligently evaluate the proposal, and it insisted that St. Paul and Roberts agree that this last minute work would not prejudice Gurney's rights under the contract. When St. Paul and Roberts did not comply, Gurney declined to permit the substitution of the machinery. At trial, St. Paul's expert conceded that even had installation of the equipment been permitted, there was no assurance that it would have met the production requirements. The changes, he admitted, were experimental and there existed serious reservations about whether they would produce satisfactory results.
 
 
 32
 The district court found that if the machinery had been installed the plant would have achieved a weekly production capacity of 100,000 pounds, but the machinery would not have produced the quality required by paragraph 7 of the contract. Nevertheless, the district court held that Gurney's conduct amounted to an election to terminate the efforts of St. Paul and Roberts, and that consequently the attainment of satisfactory production became the sole responsibility of Gurney.
 
 
 33
 Decision of this issue, however, does not rest solely on Gurney's election to terminate St. Paul's and Roberts' activities at the plant. The issue is whether Gurney acted reasonably to mitigate its damages, and this depends on whether Gurney should have permitted installation of the machinery in September 1970 without insisting upon the written information and assurances that it requested. Glidden Co. v. Hellenic Lines, Ltd., 315 F.2d 162, 164 (2d Cir. 1963). The district court made no specific findings on the reasonableness of Gurney's conduct, but the case need not be remanded for further litigation on the subject. By September 1970, fourteen months had elapsed since Roberts breached its contract. Though the plant had not achieved the performance standards required by paragraph 7, Gurney was operating, as of course it was required to do, to mitigate its damages. The installation of new machinery would have interrupted production. Because of this, Gurney was entitled to know well in advance what St. Paul proposed to do, how long it would take, and what the results would be. This information was necessary not only for Gurney's evaluation of the proposal, but also to enable Gurney to economically schedule its work force. And in view of the immediacy of trial, Gurney's demand that the work not prejudice its contractual rights was not unreasonable. See Glidden Co. v. Hellenic Lines, Ltd., 315 F.2d 162, 165 (2d Cir. 1963).[5] Moreover, Gurney's position was vindicated at trial when sufficient information about St. Paul's proposal was developed to demonstrate that the machinery it wished to install in September 1970 would not have produced yarn of the quality required by the contract. We hold, therefore, that Gurney acted reasonably and that it did not absolve St. Paul from satisfying the obligations of its bond.
 
 III
 
 34
 For the reasons stated in parts I and II, we conclude that Gurney's remedy for Roberts' failure to equip the manufacturing plant with machinery that would meet the production requirements by June 30, 1969, is not limited to withholding the 10 per cent retainage. On the contrary, Gurney is entitled to recover from St. Paul the reasonable cost of purchasing and installing machinery that will meet production requirements. Troitino v. Goodman, 225 N.C. 406, 35 S.E.2d 277, 283 (1945). St. Paul, of course, must be credited with the amount Gurney has withheld.
 
 IV
 
 35
 Gurney unsuccessfully sought to recover operating losses from July 1, 1969 to April 3, 1971 and an additional sum for loss of anticipated profits. Gurney contends that Roberts had represented that its machinery could meet the contract's production requirement with a labor complement of 94 employees. In corroboration, it introduced expert testimony that Roberts' labor budget would have been ample if the machinery had functioned properly. Because the machinery was unsatisfactory, Gurney says, it was required to employ considerably more than 94 people. Thus, Gurney claimed its unit costs were increased because (a) the plant failed to produce the stipulated 100,000 pounds of yarn per week, and (b) excess labor expense was incurred in plant operation. Deficiencies in the quality of the yarn, it says, decreased its value. These claims were documented by a profit and loss statement and a projected profit statement prepared by independent certified public accountants.
 
 
 36
 The district court found that Gurney's difficulties were caused in part by his own poor management and inadequate maintenance. Having previously concluded that the parties intended the retainage to be Gurney's sole remedy for failure of Roberts to meet the production requirements, the court ruled that it was not "within the reasonable contemplation of the parties that the alleged operating losses or alleged anticipated profits would be recoverable by Gurney in the event the mill failed to meet the production standards stated in paragraph 7 of the agreement." 334 F.Supp. at 852. The court added that in any event, Gurney's proof of these losses was "rankly speculative." It denied both claims.
 
 
 37
 In Part I we held that the production requirements were warranties, not conditions to the payment of the retainage. Under North Carolina law, therefore, Roberts is liable for all damages which result from a breach of contract. At issue is the nature of the consequential damages that can be recovered. The North Carolina Supreme Court has succinctly stated the fundamental principles governing this issue. In Perkins v. Langdon, 237 N.C. 159, 74 S.E.2d 634, 643 (1953), it said,
 
 
 38
 "[T]he general rule is that a party who is injured by breach of contract is entitled to compensation for the injury sustained and is entitled to be placed, as near as this can be done in money, in the same position he would have occupied if the contract had been performed. Stated generally, the measure of damages for the breach of a contract is the amount which would have been received if the contract had been performed as made, which means the value of the contract, including the profits and advantages which are its direct results and fruits."
 
 
 39
 In Troitino v. Goodman, 225 N.C. 406, 35 S.E.2d 277, 281 (1945), the Court emphasized that in actions for breach of contract, recoverable damages were those which "may reasonably be supposed to have been in the contemplation of the parties when the contract was made." Referring to the Restatement of Contracts Sec. 330 (1932), the Court stated that the pertinent test for recovery was whether the damages were foreseeable as a probable result of the defendant's breach. To the same effect is N.C.Gen. Stat. Sec. 25-2-715(2) (Repl.Vol.1965), which allows "[c]onsequential damages resulting from the seller's breach [for] . . . any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know . . . ." With reference to loss of profits, the Perkins Court said,
 
 
 40
 "[I]t may be stated as a general rule that the prospective profits from an established mercantile business, prevented or interrupted by breach of contract, are properly the subject of recovery when it is made to appear (1) that it is reasonably certain that such profits would have been realized except for the breach of the contract, (2) that such profits can be ascertained and measured with reasonable certainty, and (3) that such profits may be reasonably supposed to have been within the contemplation of the parties, when the contract was made, as the probable result of a breach." 74 S.E.2d at 644.
 
 
 41
 We affirm the district court's ruling that Gurney is not entitled to recover the loss of anticipated profits. Resolving conflicting evidence, the court held that Gurney's mill was not intended to produce yarn for a competitive sales market. It found its purpose was to provide material for a Gurney knitting mill located in the same town and that virtually all of its yarn was delivered to the knitting mill. This finding is binding upon us. Whether the yarn would produce a profit for Gurney when it ultimately was sold as knitted goods cannot be ascertained and measured with reasonable certainty from this record. Too much depends upon the market for knitted goods and the efficiency of Gurney's knitting mill to permit the loss of anticipated profits to be determined simply by reference to the market for yarn. Further, as the district court pointed out, Gurney could obtain yarn for its knitting mill on the open market at approximately the same price as it was billing itself for its inter-plant transactions. In short, the effect of Roberts' breach upon Gurney's profits was so remote that the district court properly disallowed this claim as speculative.
 
 
 42
 Gurney's claim for operating losses stands on a different footing. Even those North Carolina decisions which have disallowed loss of profits have nevertheless recognized that a manufacturer is entitled to recover operating losses when he has been sold defective machinery. See, e. g., D. A. Tompkins Co. v. Dallas Cotton Mills, 130 N.C. 347, 41 S.E. 938 (1902); Boyle v. Reeder, 23 N.C. 607 (1841). Roberts' officials, who are experienced in the design and construction of spinning mills, knew or reasonably could have foreseen that the probable result of an ill-equipped mill would be a decrease in production, shoddy yarn, and an increase in operating expenses. Since operating losses were foreseeable they are recoverable as an element of Gurney's damages. N.C. Gen.Stat. Sec. 25-2-715 (Repl.Vol.1965); Troitino v. Goodman, 225 N.C. 406, 35 S.E.2d 277 (1945).
 
 
 43
 It may well be, as the district court observed, that some of Gurney's operating losses were attributable to its own mismanagement, but this does not absolve Roberts for the losses it caused. Any reasonably competent cost accountant should be able to determine Gurney's operating loss, and any reasonably astute business executive should be able to allocate the loss between inferior machinery and poor management. Decisions of this kind are made daily by businessmen. Though expert testimony may be in conflict, courts traditionally and regularly have weighed the evidence to resolve similar controversies. Certainly the law should prove capable of responding to the business needs of the community by adopting procedures for reliably determining whether a manufacturing plant is operating at a loss and, if so, why. Indeed, it was to bring the law into harmony with the market place that the draftsmen of the Uniform Commercial Code said:
 
 
 44
 "The burden of proving the extent of loss incurred by way of consequential damage is on the buyer, but the section on liberal administration of remedies [Sec. 25-1-106] rejects any doctrine of certainty which requires almost mathematical precision in the proof of loss. Loss may be determined in any manner which is reasonable under the circumstances." N.C.Gen.Stat. Sec. 25-2-715, Comment 4 (Repl.Vol.1965).
 
 
 45
 Accordingly, on remand, the court should ascertain and award Gurney damages for operating losses caused by Roberts' breach of the contract.
 
 V
 
 46
 The primary defect in the building of which Gurney complains is the underfloor duct system which serves as a conduit of lint and other waste from throughout the plant. The specifications called for "Underfloor return air ducts [of] cement-asbestos type as manufactured by Johns-Manville Co. 'Transite Air Duct' or equal." From conflicting evidence the district court found that galvanized metal ductwork, which was substituted, was the equal of Transite, even though it would not last nearly as long, and it limited damages to the correction of defects in the metal ductwork. Dissatisfied with this award, Gurney seeks a sum sufficient to replace the system with Transite.
 
 
 47
 Recognizing that the longevity of the materials is only one of many factors to be weighed, and that the resolution of conflicting testimony is the duty of the trial court, we conclude from our review of the evidence that the district judge's finding was not clearly erroneous. We affirm his ruling.
 
 VI
 
 48
 Robert T. Perrin, trustee for Roberts, appeals the trial court's refusal to award it part of the retainage for the building under the theory of quantum meruit. The agreement between Gurney and Roberts was for an operational yarn spinning mill. Completion of the project was defined as including not only construction of the building, but also installation of the equipment and machinery in operating condition according to the specified standards. Since the standards were not met, we agree with the district court that the trustee is not entitled to damages.
 
 
 49
 The judgment of the district court is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We, of course, have not disturbed the district court's award of damages for items not involved in this appeal. Gurney shall recover its costs.
 
 
 
 [1]
 The initial 5 per cent of the cost was paid before construction started
 
 
 [2]
 The provisions of the contract dealing with the building are governed by Alabama law. However, neither the district court nor the parties have adverted to any difference between North Carolina and Alabama law with respect to the owner's remedies for breach of the contract
 
 
 [3]
 The rejected clause provided:
 "It is understood and agreed that Roberts undertakes to complete this contract by construction of the building, installation of the machinery, equipment and fixtures, and have the plant operating in a manner so as to meet the standards set forth above no later than the ___ day of _____, 19__, and for each day in excess of the above completion date Roberts shall be penalized the sum of Five Hundred ($500.00)."
 
 
 [4]
 N.C.Gen.Stat. Sec. 25-2-719(1)(b) provides that "resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy." Comment 2 to this section explains that remedies are deemed cumulative unless a clearly expressed intent to specify an exclusive remedy appears in the contract
 
 
 [5]
 When Hellenic Lines refused to ship ore for Glidden at the price contracted for, but offered to do so at a higher price, Glidden refused the offer unless Hellenic put it in writing. Upon Hellenic's refusal, Glidden shipped the ore in other vessels at an even higher cost than Hellenic's quote. In holding this action a reasonable effort to mitigate damages and that there was no requirement for Glidden to accept Hellenic's offer, the court said:
 "In view of the amount of money involved and the necessity of having the terms clearly understood, it was essential that the terms of Hellenic's offer be placed in writing. Indeed, an unimpeachable record was doubly important because the parties were already in disagreement over whether or not the original charter parties had been frustrated, and their differences could probably not be settled without litigation. . . ." 315 F.2d at 165.