**UNITED STATES of America for the Use and Benefit of R. E. LEE ELECTRIC COMPANY, Inc., Plaintiff,**

v.

**Clifford W. STACK, trading as C. W. Stack Company, and Hartford Accident and Indemnity Company, Defendants.**

**Civ. A. No. 4434.**

United States District Court
E. D. Virginia,
Alexandria Division.

Aug. 20, 1968.

---

2. The oral testimony referred to appears on pages 27–28 of the transcript.

Anthony S. Gallucio, Arlington, Va., for plaintiff.

Frank L. Cowles, Jr., Fairfax, Va., for defendants.

## MEMORANDUM

WALTER E. HOFFMAN, Chief Judge.

In this action under the Miller Act, 40 U.S.C. section 270b, R. E. Lee Electric Company, Inc., the use plaintiff herein, seeks a recovery from Clifford W. Stack, trading as C. W. Stack Company, and Stack's surety, Hartford Accident and Indemnity Company, for the balance due on a subcontract between the use plaintiff and Stack, together with a claim for the loss of profits occasioned by Stack's alleged wrongful removal of certain logs which the use plaintiff had agreed to sell to a third party. The total subcontract price was $11,500, and Stack had made one payment thereon in the sum of $5,175, thereby leaving a balance allegedly due in the sum of $6,325, plus interest, eliminating for the moment the claim for loss of profits with respect to the removal of the logs. Stack has filed a counterclaim seeking the recovery of $209.22, same representing the excess over and above the sum of $6,325 by way of expense in completing the use plaintiff's contract.

Stack, the prime contractor, entered into a contract with the United States of America on April 27, 1966. On the same day a payment bond was executed with Hartford Accident and Indemnity Company as surety thereon.[1] The contract called for the conversion of 25 acres of Section 29 to a park-like area in the Arlington National Cemetery. The contract became effective on May 13, 1966, at which time Stack received a "Notice to Proceed." Under the terms of the prime contract, all work other than landscape planting was to be completed "not later than 90 calendar days after the date of receipt of the Notice to Proceed." Thus, the completion date specified by the prime contract was August 11, 1966.

The description of the work was divided into seven categories, to-wit, (1) selective clearing and cleanup, (2) regrading of designated areas, (3) realignment and stabilization of stream bed, (4) improvement of storm drainage system, (5) repair and reconstruction of stone boundary wall and flagstone walls

---

[1]. Plaintiff failed to introduce the payment bond at the time of trial and no bond was then available. However, the defendants had admitted the execution of the bond in their answer. The Court denied Hartford's motion for a judgment in its favor, and directed counsel for defendants to file the bond subsequent to the trial. The payment bond was filed on June 26, 1968.

and steps, (6) topsoiling, seeding, and sodding, and (7) landscape planting. It is significant to note, however, that the item designated as "selective clearing and grading," with which we are here concerned, was *not* contemplated to be done in advance of the other work. A physical construction progress chart prepared by Stack—not finally approved by the Government until July 5, 1966—demonstrates that, with a completion date of August 11, 1966, the "clearing" was not to be finished until August 2, 1966—nine days before the final completion date.

Reasonably liberal provisions were contained within the prime contract authorizing time extensions, change orders, etc. A $30 per day liquidated damage clause was likewise inserted into this contract.

On May 31, 1966, Stack and Lee entered into a subcontract wherein Lee agreed to do the "selective clearing and clean-up" as specified in Section 1 of the prime contract. Apparently the present use plaintiff entered into this contract after Stack and a prior contractor had failed to reach an agreement. While the subcontract makes no specific reference to the prime contract, other than by Government contract number, it is clear that the parties intended for Lee to do all the work under the item "selective clearing and clean-up," designated as Section 1, paragraphs 1–01 and 1–02. *No* completion date is specified in the subcontract. It is admitted, however, that Lee was aware of the August 11, 1966, completion date for the entire contract.

The daily job reports, beginning May 23 and ending October 4, reflect in general the nature of the work being done by the prime and subcontractors as well as the weather conditions for each day. Lee told Stack at the time that the subcontract was executed that he, Lee, could not start his work for one month. This is indirectly substantiated by a note on the Government's daily job report for July 5, 1966.[2] On July 11, 1966, Lee's men reported on the job site, all of which conforms with Stack's statement to Safriet, the Government representative. Each working day thereafter, until August 4, Lee's men were on the job. On August 4, there is no explanation as to why Lee's men were not working. On August 5, neither the prime nor subcontractors did any work. The following Monday, August 8, Lee's men again reported and worked daily thereafter until September 6, 1966, believed to be the day after Labor Day—a difficult time to get laborers to report for work. September 7–9 completed that work week and Lee's men were on the job on these days. Monday, September 12, they worked. On September 13, with overcast and light rain, Lee's men did not report to the job site. Wednesday, September 14, the rain came in torrents and no one could get near the area. The weather report reflects that 4.07 inches of rain fell on that day. With such a proverbial flood, it is understandable that, at least for a few days, it was impracticable to get into the woods to haul out logs. Some rain fell thereafter—but less than one inch on each day—on September 15, 19, 20, 21, 22, 25, 27, 28, and 29, with traces of rain on two other days during that period. The daily job reports indicate that neither contractor worked on September 20 "because of rain;" on September 21 "because of rain and muddy soil." After September 12, Lee's men next reported for duty on September 22 but, in the interim, Stack had terminated the subcontract and Lee was merely attempting to salvage some of the logs which he had agreed to sell to a third party.[3] This same work was continued on September 23.

2. The note reads as follows : "The undersigned told Mr. Stack at job site that his inability to get subcontractor to start clearing would not be an excuseable (sic) delay to the contract. Mr. Stack stated that his subcontractor would start clearing 11 July 1966."

3. The contract provided that Lee could dispose of the logs in such manner as he elected.

This leads to a consideration of the events prior to September 16, which is the first day that Stack did any of Lee's work, and which was confined to moving some of Lee's logs to another area in order that Stack could seed the place where the logs had been piled.

On August 5, 1966, the Government issued a change order extending the time for completion of *all* work under the contract to September 30, 1966. The change order was accepted by Stack on August 24. This fact was apparently not communicated to Lee until Stack's letter of September 8, although Lee, as a businessman, must have realized that some extension had been granted. As Lee's men worked continuously on a five-day week basis from July 11 until September 6, with the exception of August 4 and 5, there appears to be little cause for complaint on Stack's part as Stack knew, as early as August 5 (and probably before), that an extension would be granted. On September 6, according to the Government daily job report, the estimated completion of the entire job was 96%. At all times the daily job report reflected that construction was "on schedule." At no time did the daily job reports indicate that the job was being "held up" for any cause.

By letter dated September 8, 1966, Stack wrote Lee.[4] September 8 was a Thursday. Whether the letter was mailed promptly and received on September 9 or 10, we do not know. Lee replied by letter dated September 14—written on the day of the proverbial flood—suggesting that everything was being done within reason; that he had difficulty maintaining his equipment; and that the weather had him stopped "now" and "all I can do is haul out, which I will do." He further stated that he would complete the contract "before September 30, 1966."

On Friday, September 16, Stack removed Lee's piled logs from one place to another for the purpose of topsoiling and seeding the area. Lee saw the logs being moved and, upon inquiry of Stack's superintendent, was advised that Stack had given the orders. No effort was made by Stack to communicate with Lee prior to moving the logs. In light of Stack's letter of September 8, Lee could properly assume that Stack had terminated the contract.

The next letter is dated September 29, from Lee to Stack. On that date, Stack had obviously taken over Lee's work under the contract. The tone of the letter of September 29 and all subsequent correspondence points to legal terminology and presumably these letters were prepared by counsel for the respective parties. All are self-serving documents. Only one letter is of significance. On October 6, Stack wrote to Lee, admitting that the removed logs belonged to Lee and demanding that he remove same. Lee apparently made no subsequent effort to remove the logs and, while we think it clear that Stack waived any right he may have had with respect to the time limitation for the completion of Lee's contract, it is equally clear that Lee did nothing to minimize his damages by salvaging the logs in question. We do not believe that Lee's claim for loss of profits on any contemplated sale of the logs is entitled to consideration.

On October 4–5, the Government made a final inspection of the job. As may be expected, various deficiencies were noted. At that time the job was estimated to be 99.8% complete. It was an

---

4. The letter reads as follows:
  "This subject contract must be completed in its entirety by September 30, 1966. This date does not in itself constitute an extension of time insofar as your subcontract is concerned but is a coverage for seeding disturbed areas.
  "It is absolutely essential that your trees and logs be removed by September 15, 1966 in order for us to complete the general contract items pertaining to restoration and seeding.
  "In the event that tree removal is not completed by this date, we will be compelled to execute the work ourselves and charge the cost therefor to the balance of your contract."

estimated 99% complete on September 29, and 97% on September 16. Apparently Stack did not complete the entire contract to the satisfaction of the Government until November 15, 1966.

At no time was Stack ever penalized for the delay. The liquidated damage provision of the prime contract was not enforced.

While it is unnecessary to comment with respect to Stack's counterclaim, it is rather apparent from the examination of the witness, Garwood, that the claim was prepared for litigation purposes and cannot be supported in fact to any substantial extent.

Stack urges that the extension granted by the Government did not extend the completion date of August 11 as far as the subcontract was concerned. He states that he did not advise Lee of the extension as he realized that Lee was behind in his work and, if Lee had been advised of the extension, Lee would drop even further behind.

Assuming arguendo the correctness of Stack's argument that the extension granted by the Government did not operate to extend Lee's time, we nevertheless feel that this is a clear case of waiver by Stack with respect to the August 11 completion date. To accept Stack's argument would result in Lee's continuing in the performance of the subcontract at the mercy of Stack. Stated otherwise, if Lee, at anytime after August 11, had performed his contract to the point of 97% completion and could fully perform with eight more working days, Stack could give a five-day notice of termination and Lee would be forced to litigation.

Stack had a perfect right to negotiate with Lee for a new and binding completion date when he became aware of the fact that the Government would extend the time. This he did not do. He had a perfect right to insist upon the insertion of a completion date in the subcontract accepted by Lee on May 31, 1966. This he failed to do even though Stack's physical construction progress chart re-flects that Lee's work was not scheduled for completion as to "clearing" prior to August 2, 1966. It was never within the contemplation of the parties that Lee would be required to complete his work under the subcontract at any time prior to the completion date specified in the prime contract.

■ We think that this case is essentially controlled by the principles stated in Goldstein v. Old Dominion Peanut Corporation, 177 Va. 716, 15 S.E. 2d 103 (1941). Assuming, without deciding, that Stack could have legally terminated Lee's subcontract on August 12, at which time the entire contract was estimated to be 92% completed—and Lee had admittedly not completed his work—Stack thereafter permitted Lee to continue work without conditions or limitations. The language of the Supreme Court of Appeals of Virginia in *Goldstein* is sufficient, where it is said:

> "Rights arising from delay in performance may be waived. When work is to be done by a time certain, the employer, by allowing it to go on afterwards, thereby treating the contract as still in force, waives the materiality of time and can claim only such damages as he has sustained by reason of the delay. In other words, even where time is of the essence, a breach of the contract in that respect by one of the parties may be waived by the other party's subsequently treating the contract as still in force."

Once having waived the time requirement, to what period is the limitation extended? In the absence of any supplementary agreement or understanding, if Lee had until August 11 to complete his work under the subcontract, and this time limitation was clearly waived by Stack, we must assume that Lee then had at least until the expiration of the extension period which, in this case, was until September 30. Arbitrarily, Stack advanced Lee's completion date to September 15. Lee replied by stating, in effect, that he could not complete by September 15, but would do so by September 30.

It is perhaps true that, by reason of weather conditions, Lee could not have performed by September 30, but Stack committed an anticipatory breach of the contract by writing his letter of September 8 and, on and after September 16, Lee was at least doubtful as to his status with respect to the contract. Stack did not reply or agree to Lee's proposal set forth in Lee's letter of September 14 indicating that the work would be completed by September 30. The next letter written by Stack was dated October 6, after the final inspection by the Government, and subsequent to the time when Stack had taken over Lee's work. It was not until the receipt of this letter that Lee was advised that he (Lee) could still do work under the subcontract. Lee replied by letter dated October 11 stating in part: "If it is your intention to perform any future work on our part of contract then I will proceed to complete my contract to the satisfaction of the Corps of Engineers. Please notify me of your intentions." There was no reply to this letter. On October 25, Lee sent Stack a bill for the balance due under the contract, same being in the sum of $6,325.[5] The next and final communication from Stack was the letter of November 18 enclosing a breakdown of costs allegedly incurred by Stack in completing Lee's subcontract.

We need not consider, in the light of the foregoing comments, the effect of bad weather beginning September 14 on the total performance of the subcontract. We hold that Stack breached the contract by insisting upon a completion date of September 15 and, since Stack did not thereafter agree to Lee's offer to complete by September 30, the factor of weather is not of importance. Undoubtedly, as disclosed by the daily job reports and weather reports, the effect of the heavy rain on September 14, together with lighter rains thereafter, was to make the soil muddy and thus hamper the use of heavy equipment to haul out logs. While defendants make much of Lee's statement in his letter of September 14 that "all I can do is haul out, which I will do," this is immaterial in light of Stack's prior declaration of intent to terminate if the work was not completed by September 15. Furthermore, for what it may be worth, Lee could not reasonably anticipate the effect of the rain on September 14 and subsequent thereto. We do not hold, however, that adverse weather conditions common to the construction industry constitutes an excuse in failure to perform.

■ It is a generally accepted rule that a party prevented from performing a contract is at liberty to treat the contract as broken, abandon same, and recover damages for the breach. 17 Am. Jur.(2d), Contracts, section 442, page 899. While the parties agreed in the instant case to refer the issue of damages to a special master, if the plaintiff has expended as much as Lee suggests by way of payroll, it would appear that plaintiff would be entitled to the balance due upon the original contract price, plus interest at the rate of 6% per annum from December 1, 1966. Without restricting the parties as to the submission of damages to a master, the Court will grant a period of thirty (30) days from this date to consider the matter further in an effort to arrive at some agreement. If no agreement is reached, or if either party desires to appeal, an interlocutory order will be entered and, if desired, the Court will certify the case as proper for an appeal from an interlocutory order as this memorandum opinion essentially disposes of all pertinent issues.

5. To a limited extent, at least, this demonstrates a waiver or intention, on the part of Lee, not to claim for damages allegedly sustained by Stack's removal of Lee's logs. Substantially all logs had then been removed.