GURNEY INDUSTRIES, INC., Plaintiff,
and Commercial Credit Industrial
Corp., Involuntary Plaintiff,

v.

ST. PAUL FIRE AND MARINE
INSURANCE COMPANY,
Defendant.

Robert P. PERRIN, Trustee in Reorganization for Roberts Company and Roberts Engineers, Inc., Intervenor,

v.

GURNEY INDUSTRIES, INC., and
Commercial Credit Industrial Corp.

Civ. A. No. 2614.

United States District Court,
W. D. North Carolina,
Charlotte Division.

Nov. 11, 1971.

———◆———

Hunter M. Jones, Charlotte, N. C., Beverly C. Moore, Greensboro, N. C., James Mullen, Gastonia, N. C., and Walter S. Beck, New York City, counsel for plaintiff.

Francis H. Fairley, Charlotte, N. C., counsel for Commercial Credit Industrial Corp., involuntary plaintiff.

Welch Jordan, Greensboro, N. C., and Jack Hart, New York City, counsel for St. Paul Fire and Marine Ins. Co., defendant.

A. L. Meyland, Greensboro, N. C., counsel for Robert P. Perrin, Trustee in Reorganization for Roberts Co. and Roberts Engineers, Inc., intervenors.

### Memorandum of Decision and Order

McMILLAN, District Judge.

### THE NATURE OF THE CASE

Gurney Industries, plaintiff, sued St. Paul, the defendant, for alleged damages and for alleged equitable relief due to alleged non-performance of a contract by the two Roberts companies, the principals on St. Paul's performance bond. The case was tried without a jury in three installments for a total of twenty-one days. Testimony at the trial, not counting depositions and exhibits, amounts to twenty-five hundred pages. Essential findings of fact and conclusions of law follow.

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND JUDGMENT

### FINDINGS OF FACT

1. Gurney Industries, Inc., a Gastonia, North Carolina textile corporation, owned several textile mills including a knitting mill in Prattville, Alabama. Gurney contracted with Roberts Company and Roberts Engineers, Inc., of Sanford, North Carolina, to build a new yarn spinning mill for Gurney in Prattville, Alabama, for a contract price of $3,500,000.00. The new spinning plant was intended to supply yarn for Gurney's existing knitting mill in Prattville. The local government (Autauga County, Alabama) provided the financing for the land acquisition and Commercial Credit Industrial Corp. provided the financing for the machinery. The details of those arrangements are not material to the decision of the fundamental issues in the case. St. Paul Fire and Marine Insurance Company issued a performance bond in the principal amount of $3,400,000.00 guaranteeing Robert's performance of the contract.

2. The contract between Roberts and Gurney was executed as of September 23, 1968. It employed Roberts to design, construct and fully equip a spinning mill for three and one-half million dollars in Prattville, Alabama. It appointed Roberts Engineers to see that the work was done according to plans and specifications and that the plant was built so as to be generally similar to a yarn mill recently built by Roberts at Clarkton, North Carolina. It called for the installation of specifically listed machinery and equipment.

3. Paragraph 6 of the contract states in part that

"Gurney has authorized Roberts Engineers to proceed with the necessary engineering work, the placement of orders for machinery and equipment, and otherwise to proceed with the completion of Roberts Engineers' obligation under this contract as soon as is reasonably possible and consistent with proper construction, design and engineering standards."

4. Paragraph 7 of the contract dealt with payments by Gurney—with the time and manner and amount of payments by Gurney to Roberts. Paragraph 7 read as follows:

"7. Each month during the course of this Project, Roberts Engineers will submit to Gurney invoices representing eighty-five per cent (85%) of the value of work performed on the construction, and on the project machinery listed in Schedule III, plus materials and project machinery delivered to the job site or suitably stored,

less the aggregate of prior progress payments, which invoices Gurney shall arrange to have paid net within ten (10) days after invoice date, and Roberts will submit to Commercial Credit invoices representing eighty-five per cent (85%) of the agreed price of project machinery listed in Schedule IV delivered to the job site and/or suitably stored in a manner acceptable to Gurney, less the aggregate of prior progress payments.

*"The remaining ten per cent (10%) of the Contract Price shall be paid upon acceptance of the Project, by Gurney as to Schedule III, and by Commercial Credit as to Schedule IV, after certification by Roberts Engineers that the Project has been completed. 'Completion of the Project'* shall mean: (a) That the building has been constructed in accordance with the Building Contract Documents, and such construction and engineering has been approved, (b) That all equipment, machinery and fixtures have been installed and are in operating condition, (c) That the machinery and equipment is *capable* of producing 100,000 pounds of 26's single yarn of sixty per cent (60%) combed cotton and forty per cent (40%) carded cotton material each week through said Mill; and (d) That the product at each stage of the manufacturing process of the yarn meets the "A" Quality Standards established by N. C. State University, at Raleigh, North Carolina, which said standards are attached hereto as Schedule V. In the event the Parties hereto fail to agree as to the fulfillment of such product standards, samples of each product at each stage of the manufacturing process shall be submitted to N. C. State University Testing Division for final determination of the issue." (Emphasis added.)

5. Paragraph 9 of the agreement read as follows:

"9. It is understood that *Roberts Engineers will be required to test the operation of the Mill in the manufacture of yarn* and, to this end, Gurney agrees to furnish the labor necessary for this operation and to provide the material for the manufacturing process. The labor is to be paid by Gurney, and Gurney is to pay for the cotton and the power." (Emphasis added.)

6. Paragraph 11 of the contract read as follows:

"11. Roberts Engineers *projects* the following time schedule for the various stages of the project, starting from date of execution of this Agreement and written notification from Autauga County that the sale of its proposed Bonds has been consummated and the plant site made available for commencement of construction.

| | Activity | Increment Time Lapse | Total Time Lapse |
|---|---|---|---|
| 1. | Completion of Site Preparations and Foundations | 2 weeks | 2 weeks |
| 2. | Steel and Roof Structure | 4 weeks | 6 weeks |
| 3. | Walls | 10 weeks | 16 weeks — |
| 4. | Floor | 8 weeks from week 6 | 16 weeks |
| 5. | Utilities & Exterior Finish | 12 weeks from week 6 | 20 weeks |
| 6. | Machine Erection | 16 weeks from week 16 | 32 weeks |
| 7. | First Yarn Production | | 22 [sic] weeks |
| 8. | Building and Installation Completed | | 34 weeks |
| 9. | Full Plant Start-up | | 42 weeks" |

(Emphasis added.)

7. However, no time of completion was guaranteed, and no penalty was provided in the contract for failure to complete the work by a particular day.

8. Actual construction of the mill had begun several months before the formal execution of the contract. Actual manufacture of some of the machinery had also begun at earlier times.

9. The building was completed and the machinery was installed and capable of operating and there was, in fact, a "full plant start-up" by May of 1969, within forty-two weeks from the original contract date. During the summer of 1969, the mill exceeded ninety thousand pounds a week in *quantity* of output of spinning yarn. However, it never at any time reached one hundred thousand pounds of yarn per week and it never produced any substantial amount of yarn which met the "A" *quality* standards of North Carolina State University at Raleigh, which were referred to in the contract provisions of paragraph 7 relating to payments. The mill operated from the early summer of 1969 until the time of the trial in 1971 at varying production levels, the highest production level being about ninety-four thousand pounds a week.

10. From the time the plant started operation until late September, 1970, Roberts kept men in the Gurney plant replacing and adjusting and repairing machinery and making changes in operating procedures and otherwise attempting to bring the plant up to its anticipated maximum capacity of quantity and quality of yarn. In September, 1970, Roberts brought two truck loads of machinery, as recommended by Roberts' consultant, Luke Thomason, to the plant at Prattville and announced intention to install it in place of some existing machinery. It was the contention of Roberts that the new machinery would bring the plant up to the performance levels described in paragraph 7 of the contract, although it was not anticipated this machinery would produce "A" quality yarn as described in paragraph 7 of the contract. Gurney took the view that the Roberts proposals were makeshift expedients which would not produce the desired quality or quantity and that the defendant should replace most of the machinery with new machinery of Gurney's now desire and design.

11. Gurney would not allow the new machinery to be installed, and Roberts called its men off the job and ceased its efforts to perfect the installation.

12. The reasons that the mill did not perform as anticipated were various. Substantial groups of machines were ultimately recognized by Roberts as being improperly perfected or designed for the job at hand. There were problems with ventilating and with materials handling equipment. Some of the machines were prototype machines which had never been tested under actual operating conditions and the "bugs" had not been worked out. In short, on the subject of quality, the machinery never had the capacity to produce substantial quantities of "A" quality yarn by the State College academic standards. Another group of reasons had to do with the plaintiff Gurney. The demand for textiles dropped off noticeably after the contract was signed. The incentive to produce large quantities of yarn was thus diminished. The operation of the mill by Gurney was poorly managed. Maintenance, service and adjustment schedules were not adopted. There was a great deal of "down time" on machines because of poor servicing and adjustment. A third factor which is difficult to measure is that all the yarn production was "captive" yarn, intended for use by Gurney in Gurney's own Prattville knitting plant, rather than for sale to other knitters and weavers on the open commercial market. What the plant could have produced in quantity and quality if its management had been competing in the open market is in dispute.

13. The court finds that if the machinery Roberts brought to the plant in September, 1970, had been allowed to be installed, the plant would have had the 100,000-pound weekly capacity as far as quantity is concerned, but that it would not have been able to produce the *quality* described in paragraph 7 of the contract.

14. There are essentially two phases to the case: (1) Deficiencies in the construction of the mill structure, and (2) Incapability of the machinery and

equipment to produce, in a work week of 120 hours, 100,000 pounds of 26's single yarn of sixty per cent combed cotton and forty per cent carded cotton material, with the product at each stage of the manufacturing process meeting the "A" Quality Standards established by North Carolina State University, at Raleigh, North Carolina.

15. The greater amount of the evidence had to do with alleged deficiencies in the building structure. The mill building and building facilities constructed at Prattville were substantially constructed and completed, aside from the deficiencies herein described, in accordance with the plans and specifications prepared by Roberts Engineers, as provided by the terms and provisions of the agreement of September 23, 1968. The building and building facilities have been used continuously as a spinning mill by Gurney since May, 1969. However, there are certain deficiencies in the building and building facilities for which the plaintiff is entitled to monetary compensation as follows:

(a) The original building specifications provided that the "Underfloor return air ducts shall be cement-asbestos type as manufactured by Johns-Manville Co. 'Transite Air Duct' or equal"; the underfloor ducts which were actually installed were constructed of galvanized metal. Gurney contended that the entire underground duct system should be torn out and replaced with "Transite." The evidence established that the change to metal was made with the knowledge of Gurney when Roberts discovered in the spring of 1968 that "Transite" pipe installations in other spinning mills proved unsatisfactory. The evidence shows that although galvanized metal construction may not last as long, it is functionally superior to "Transite." It was also established that the cost of the galvanized metal construction at the Prattville mill was over $160,000 higher than the "Transite" system

would have been, and this additional cost was absorbed by Roberts without an increase in the contract price to Gurney. Gurney's objection to the change from "Transite" to metal was made for the first time several months after the institution of this action and appears to be an afterthought. The court finds the metal duct work to be the "equal" of "Transite", but there were some deficiencies in the installation of the underfloor metal duct work, and for these the plaintiff is entitled to recover the sum of Twenty Thousand Dollars ($20,000).

(b) For repair of leaks in the roof the plaintiff is entitled to recover the sum of Three Thousand Dollars ($3,000).

(c) For the expense of constructing a waste room and supply room the plaintiff is entitled to recover the sum of Eighteen Thousand Four Hundred Fifty-Three Dollars ($18,453).

(d) For moving the bale press and condenser from its present location to a new waste room the plaintiff is entitled to recover the sum of Two Thousand Four Hundred Fifty Dollars ($2,450).

(e) For necessary changes and improvements in the air handling equipment as described by the defendant's witness Thomason, the plaintiff is entitled to recover the sum of Thirty-Two Thousand Nine Hundred Fifty-Three Dollars ($32,953).

(f) For additional miscellaneous costs, including expenses of moving machinery, the plaintiff is entitled to recover the sum of Twenty-Five Thousand Dollars ($25,000).

16. The relatively small deviations in floor levels have not impaired the utility of the building and the plaintiff is not entitled to any monetary compensation by reason of these variances in floor levels.

17. The peeling of some of the interior paint in the bulilding was not

shown to be the fault of Roberts. The peeling of paint occurred in areas which were repainted after a fire. The plaintiff is not entitled to any monetary compensation because of paint having peeled.

18. Roberts and Gurney originally planned to install Saco-Lowell combers in the Prattville plant, but Gurney later decided to place some combers which it had in another plant in the Prattville plant. The reason for changing the location of the combers was to accommodate the installation of the Gurney-owned combers. The proposed relocation of the combers was submitted to and approved by Gurney before the concrete floor was poured. The plaintiff is not entitled to any monetary compensation because of the relocation of the combers.

19. Roberts, in substantial compliance with the provisions of the agreement of September 23, 1968, furnished and installed the specified machinery and equipment so that actual production at the mill began in or about May, 1969.

20. The fact that the Roberts Dynacards were built on Saco-Lowell chassis with re-machined Saco-Lowell main cylinders is not a basis for compensation, because Gurney knew or should have known this fact and the evidence established that the functioning of the Dynacards was not impaired and may have been enhanced by this type of construction.

21. The roll buffing machine which was originally installed by Roberts as a part of the specified machinery and equipment in the Prattville spinning plant was not adequate for the purposes for which it was intended to be used and the plaintiff is entitled to have this machine replaced. The Trustee of Roberts purchased with funds supplied by St. Paul an Armstrong roll buffing machine. This machine was shipped to Prattville by the Trustee of Roberts in September, 1970, and was returned to Sanford, North Carolina, when Gurney refused to allow any additional machinery or equipment to be brought into the mill. The plaintiff is entitled to recover the sum of Five Thousand Five Hundred Dollars ($5,500), the reasonable cost of replacing the buffing machine.

22. The incinerator which was installed by Roberts at the Prattville spinning plant at a cost of $7,200 was an extra which was not included in the original total contract price. Therefore, plaintiff's recovery should be reduced by $7,200.

23. None of the pleadings alleges that there were material misrepresentations of fact upon which any party relied to its detriment. There is no issue or evidence of fraud in this case. All of the parties were represented by responsible and capable representatives who took appropriate measures for the protection of their respective interests.

24. All the progress payments required to be made by Autauga County and Commercial Credit under paragraph 7 of the September 23, 1968, agreement were made by July, 1969, so that only retainages remained unpaid. The parties stipulated upon the trial and the court finds that the retainages amounted to $329,585.22.

25. Based on the language of the agreement of September 23, 1968, and the evidence introduced by the parties bearing upon the intention of the parties, the court finds that although the contractor's self-imposed production schedule called for "full plant start-up" in 42 weeks, that schedule was substantially met; that there was no fixed date to achieve the production standards of paragraph 7; that time was not of the essence in achieving the production standards; and that under the contract, if the machinery and equipment specified in the agreement to be furnished by Roberts proved incapable of meeting the production standards stated in paragraph 7, the retainages would not become payable, the contract price would

be reduced by the amount of the retainage, and Gurney would not be entitled to any other recovery arising out of the incapability of the specified machinery and equipment to meet such standards.

26. During the period from the spring of 1969 until about the middle of September, 1970, Roberts and its Trustee, seeking to become entitled to the retainages, continued efforts to bring the mill to the capability of meeting the production standards stated in paragraph 7 of the September 23, 1968 agreement. These efforts were hampered to some extent by the lack of motivation and cooperation on the part of Gurney to bring the mill to its full potential. During the period in question there was a declining market for knitted fabric and knitting yarn, which resulted in Gurney's curtailing production and shutting down some of its other spinning mills during this period. Between June and August, 1969, the mill came close to meeting the standards of paragraph 7, but thereafter there was a steady decline in quality of production. This was caused by several things: Inadequacy of the Roberts machinery and installation; poor quality of some of the cotton which was being processed; lack of adequate supervision and training of operator personnel; maintenance failures; lack of sufficient mill supplies; and unwillingness of Gurney to make a sustained effort to operate the spinning plant at its full potential.

27. Gurney at no time declared the agreement with Roberts terminated and permitted Roberts' and, thereafter, the Trustee's personnel to continue their efforts at the mill well into September, 1970, when, as above set forth, Gurney prohibited the machinery and equipment prescribed by Thomason from being brought into the mill and Roberts' Trustee declared Gurney to be in material breach of contract and left the job. Gurney's conduct in permitting Roberts and the Trustee to continue their efforts without terminating the agreement

may well amount to a waiver of the time for performance, as would have been the case even if time had been of the essence.

28. There is no merit in Gurney's contention that St. Paul, as surety, failed to act promptly. The conditions precedent to the surety's obligations under the bond were that the "Contractor [Roberts] shall *be*, and declared by Owner [Gurney] to be in default * * *." [Emphasis added.] Although Gurney did not terminate Roberts and waived time for performance, the surety, together with Roberts' Trustee, procured and began the implementation of the "Thomason program" at considerable expense and were engaged in their continuing effort to bring the mill to its full potential when in the middle of September, 1970, Gurney, without prior notice to the Trustee or St. Paul, prohibited further effort, thus relieving the surety and the Trustee from further affirmative duty to continue with their efforts. After Gurney elected in September, 1970, to terminate the efforts of St. Paul and the Trustee, the matter of production in the mill became the sole responsibility of Gurney without any obligation on the part of Gurney to return any of the machinery and equipment located in the mill.

29. It is immaterial that the parties never submitted samples of the product being produced at the mill to North Carolina State University Testing Division, as provided in paragraph 7 of the agreement.

30. The Prattville mill was not intended to be and never functioned as a mill to sell yarn on a competitive sales market. The basic purpose of the mill was to provide cotton yarn for the Gurney knitting mill which was also located in Prattville; and, in fact, virtually all the yarn produced was delivered to and used at the nearby Gurney knitting mill in Prattville, Alabama.

31. The court finds that the prices credited by Gurney the knitter to Gur-

ney the spinner for the output of Gurney the spinner, after taking transportation and selling costs into account, were not demonstrably less than what Gurney the knitter would have paid on the open market for its knitting yarns. On this record, the failure of the yarn to meet the "A" grade academic standards of State College does not appear to have caused Gurney any measurable amount of loss.

32. The agreement of September 23, 1968, the events leading to the execution of the agreement, and the circumstances surrounding the making of the agreement, including certain proposed direct labor budgets and other information exchanged, discussed and considered by Roberts and Gurney, do not indicate that the parties intended that Roberts was underwriting the future of the Prattville spinning plant as an enterprise which would, in fact, produce 100,000 pounds of grade "A" yarn each 120-hour work week upon a basis which would yield profits to Gurney. While Gurney had been in the cotton yarn spinning business for many years, the Prattville plant was a new type spinning mill. It was not within the reasonable contemplation of the parties that the Prattville spinning mill was to produce yarn for sale in a competitive yarn market, nor was it within the reasonable contemplation of the parties that the alleged operating losses or alleged anticipated profits would be recoverable by Gurney in the event the mill failed to meet the production standards stated in paragraph 7 of the agreement. In any event, Gurney's evidence of alleged operating losses and loss of possible profits was rankly speculative.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of this action pursuant to 28 U.S.C. § 1332.

■ 2. The plaintiff is entitled to judgment against St. Paul, Roberts and Roberts Engineers, jointly and severally, in the total net amount of One Hundred Thousand One Hundred Fifty-Six Dollars ($100,156.00), computed as follows:

| | |
|---|---|
| (a) For the items listed in Finding of Fact No. 15, the total sum of | $101,856.00 |
| (b) For a new roll buffing machine, Finding of Fact No. 21 | + 5,500.00 |
| Subtotal: | $107,356.00 |
| (c) Less credit due for incinerator, Finding of Fact No. 22 | − 7,200.00 |
| Net Total: | $100,156.00 |

■ 3. The plaintiff is not entitled to interest prior to the entry of judgment on the said net amount of $100,156.00 for which it is entitled to judgment.

■ 4. Time was not of the essence under the agreement of September 23, 1968. In any event, however, the plaintiff, by failing to terminate the agreement and permitting Roberts to continue work, waived the materiality of time (United States for Use and Benefit of R. E. Lee Electric Co. v. Stack, 308 F.Supp. 46, 50 (D.C., E.D.Va., 1968), affirmed on opinion below, United States for Use and Benefit of R. E. Electric Co. v. Stack, 420 F.2d 698 (4th Cir., 1970)).

■ 5. Under the agreement of September 23, 1968, the retainages (which the parties stipulated amounted to $329,585.22) were not to be paid to Roberts if the machinery and equipment specified by the agreement was delivered and installed but failed to demonstrate a capability of meeting the quality and quantity standards stated in paragraph 7 of the agreement. The specified machinery and equipment was delivered and installed but did not demonstrate such capability. Accordingly, the retainages did not become payable and Roberts is not entitled to recover any part of the retainages.

6. Under the agreement of September 23, 1968, if the specified machinery and equipment was delivered and installed and lacked the capability of meeting the standards stated in paragraph 7, the extent of the liability to be incurred by Roberts was that it would not become entitled to the retainages,

leaving solely to the plaintiff the changes, if any, it might decide to make in the specified machinery and equipment.

■ 7. The agreement of September 23, 1968 did not contemplate or intend that if the specified machinery and equipment was delivered and installed but failed to demonstrate the capability stated in paragraph 7, that Gurney should become entitled to alleged "operating losses" or alleged loss of profits. The evidence introduced by plaintiff of alleged "operating losses" and alleged loss of profits was rankly speculative. Plaintiff is not entitled to any recovery for alleged "operating losses" or alleged loss of profits (Boyle v. Reeder, 23 N.C. 607, 614 (1841); Howard v. Stillwell & Bierce Mfg. Co., 139 U.S. 199, 11 S.Ct. 500, 35 L.Ed. 147 (1891); Tompkins v. Dallas Cotton Mills, 130 N.C. 347, 41 S.E. 938 (1902)).

■ 8. The plaintiff failed to establish any basis for its claim that an injunction should issue against St. Paul, in effect, directing St. Paul "to remedy its Principal's default promptly."

9. For the reasons above stated, Roberts' Trustee is not entitled to any recovery against either the plaintiff or Commercial Credit, the involuntary plaintiff. This determination makes moot Commercial Credit's contention that if it should be determined that the Trustee was entitled to recovery against Commercial Credit, Commercial Credit would be entitled to certain offsets against the Trustee.

10. In accordance with the foregoing, judgment in the amount of One Hundred Thousand One Hundred Fifty-Six Dollars ($100,156.00), with interest after the date of judgment, should be entered in favor of the plaintiff against St. Paul, Roberts and Roberts Engineers, jointly and severally, and all other claims made herein by any party against any other party should be dismissed.

11. Costs, not including attorneys' fees, shall be allowed to plaintiff against the defendants.